**2016 UT App 102**

## THE UTAH COURT OF APPEALS

TELEGRAPH TOWER LLC AND JARED CHRISTIANSEN,
Appellants,
*v.*
CENTURY MORTGAGE LLC, ET AL.,[1]
Appellees.

Opinion
No. 20140489-CA
Filed May 12, 2016

Fifth District Court, St. George Department
The Honorable G. Michael Westfall
The Honorable James L. Shumate[2]
No. 100503310

Bryce D. Panzer and Brett N. Anderson, Attorneys
for Appellants

Bruce C. Jenkins and Carson B. Bagley, Attorneys for
Appellees VF Parties

Russell S. Mitchell, Attorney for Appellees Lyle
Stringham and Barbara Stringham

George A. Hunt and Timothy J. Bywater, Attorneys
for Appellee Harris Property Investments LLC

---

1. The parties on appeal are not limited to those listed, but also include other parties whose names appear on the notice of appeal or who have otherwise entered appearances in this court.

2. Judge G. Michael Westfall was assigned this case after Judge James L. Shumate retired from the bench in March 2014. All orders relevant to this appeal were decided by Judge Shumate.

JUDGE KATE A. TOOMEY authored this Opinion, in which JUDGE J. FREDERIC VOROS JR. and SENIOR JUDGE RUSSELL W. BENCH concurred.[3]

_____

TOOMEY, Judge:

¶1     Jared Christiansen and Bradley S. Harrell, through their company Telegraph Tower LLC (collectively, Borrowers), asked a lending company, Century Mortgage, for a loan to complete a construction project (the Project). Century Mortgage agreed and sought money from various individuals and business entities (collectively, Investors) to fund the loan. In essence, Century Mortgage acted as a middleman between Borrowers and Investors. It executed an agreement with Borrowers promising to make funds available as needed for the Project. It also executed an agreement with Investors, agreeing to service the loan, including preparing all necessary paperwork and obtaining information about the Project. At some point, Century Mortgage misplaced the money[4] and construction on the Project was forced to stop for lack of funds. Borrowers sued Investors and Century Mortgage under various legal theories. Particularly, Borrowers claimed Investors were vicariously liable for the tortious actions of Investors' agent, Century Mortgage. Investors responded that Century Mortgage was Borrowers' agent and all duties were fulfilled when Investors deposited their contributions to the loan in Century Mortgage's bank account.

_____

3. Senior Judge Russell W. Bench sat by special assignment as authorized by law. *See generally* Utah R. Jud. Admin. 11-201(6).

4. It is unclear what happened to the loan proceeds. When Borrowers asked Century Mortgage about the money, one of Century Mortgage's principals, Donald Larkin, responded that the "[m]oney is where it is . . . we intend to get [it] for you." Larkin later explained, "Let's just say that we tried something and it didn't work out like we planned," and there is "no money in the account."

¶2    In this appeal, we must determine whether the district court correctly granted summary judgment on all relevant causes of action. We affirm in part and reverse in part. Upon review of the issues, we conclude the court improperly granted summary judgment before deciding an agency issue and improperly limited Borrowers' damages. But we affirm the court's conclusion that Investors are not jointly and severally liable.

BACKGROUND

I. Factual Background

¶3    Because of the complexities of this case, we first introduce the parties involved and describe their relationships with one another, then describe the procedural posture that gave rise to this appeal. We recite only the facts and procedural background relevant to this appeal.

*Century Mortgage and Borrowers*

¶4    In 2008, Borrowers sought to develop real property Christiansen owned on Telegraph Street in Washington City, Utah. With plans to construct a commercial office building on the property, Borrowers pursued financing from Century Mortgage for the approximately $2.8 million needed for the Project. Century Mortgage did not immediately agree to fund the Project but instead reached out to various individuals and entities to solicit their investments. This effort was successful, and Century Mortgage eventually agreed to assist Borrowers.

¶5    By early 2010, Century Mortgage had disbursed roughly $490,000 in funds it had collected for the Project on behalf of Borrowers to prevent the property from being subject to foreclosure, including approximately $475,000 for a "Land Payoff" to Village Bank; roughly $10,000 for property taxes; and $4,555 for closing costs.

¶6    In April 2010, Borrowers executed and recorded a trust deed and note in favor of Investors. A couple weeks later, Century Mortgage and Borrowers executed a loan agreement (the Construction Loan Agreement), which promised Borrowers approximately $2.8 million for the Project. Instead of paying Borrowers the loan in one lump sum, the agreement set forth conditions and requirements for Borrowers to receive it in portions as needed. Further, the agreement described Century Mortgage as Investors' agent in servicing the loan and executing the agreement. Specifically, the Construction Loan Agreement stated it was made "by and between the undersigned Telegraph Towers LLC., Jared Christiansen and Bradley Harrell individually (borrower) and Century Mortgage, as agent for [Investors]." It identified the names of each individual investor and the percentage of interest to which each investor was entitled. Further, the agreement provided that

> [u]pon the recordation of the Trust Deed, the net proceeds of the loan will be available to be disbursed by [Century Mortgage[5]] to the undersigned Borrower or others as hereinafter provided which shall be conclusively deemed full consideration for the Note and that such consideration has fully passed and been paid to the Borrower.

¶7    In June and July 2010, according to Christiansen, "Century Mortgage fully funded several draws totaling approximately $256,389.72" to pay for pre-construction costs. But by August, after major construction had begun, Century Mortgage stopped responding to Borrowers' requests for funds.

---

5. We note that, in the first sentence of the Construction Loan Agreement, Investors are referred to as "investors." But thereafter Investors are referred to as "lenders." Moreover, the term "lenders" is often used interchangeably when referring either to Investors or to Century Mortgage.

Through their attorney, Borrowers sent Century Mortgage a written request for a meeting. According to Christiansen, in that meeting Century Mortgage informed them that "there [was not] actually any money at all. All the money that [they] collected ha[d] been spent." At this point, Borrowers alleged, Century Mortgage had "failed to fund at least $1,138,703.31 in loan proceeds that should have been available for construction of the Project." As a result, Borrowers were unable to pay subcontractors and suppliers, and then at least thirteen mechanic's liens were recorded against the property.

*Century Mortgage and Investors*

¶8    According to its brochure materials, once Century Mortgage received a loan request, it would reach out to prospective investors who had expressed interest in similar investment opportunities and allow them to choose whether to participate in a particular venture either by funding the entire loan or by sharing the investment with other parties. Here, Century Mortgage identified various individuals and entities to contribute funds to the Project, some of whom had previously used Century Mortgage's services to invest in other projects. Others agreed to invest through Century Mortgage for the first time.

¶9    In April 2010, most of Investors executed an agreement (the Investors Agreement) by which they promised to fund the loan requested by Borrowers. The Investors Agreement specified the amount each investor agreed to contribute. It expressly stated,

> Century Mortgage agrees to act as agent for the above investors in gathering pertinent information about the property and principals involved and making such information available to the investors, along with a recommendation. Century Mortgage is not a guarantor of the note and the signers herein agree that neither it nor its principals acting

on its behalf are liable in any way for the success or failure of this venture except as to misrepresentation or omission of material facts of which they are aware. The investment decision is solely that of the investor.

It also set forth Century Mortgage's responsibilities:

Century Mortgage agrees to prepare, or have prepared documents necessary to complete this transaction in a businesslike manner. This will include a Trust Deed, Trust Deed Note, closing statements, and Title Insurance. The deeds and notes will bear the investors names and the borrowers obligation will be solely to the investors so named. However, Century Mortgage will service the loan for the length of its regular term, gathering the money to be invested and distributing it to the Title Co. for the lot (or land), holding the balance on a construction loan and distributing it to the contractor periodically as needed, upon completion of each part of the home or project, collecting monthly interest payments, assessing necessary late fees, calculating principal and interest, and forwarding the amount due each investor promptly.

¶10 A few prospective investors did not execute the Investors Agreement, or any other agreement, but nevertheless promised to invest in the Project. One investor entered into a series of separate contracts with Century Mortgage agreeing to invest a total of $600,000 for the Project.

¶11 Although Investors dispute whether they are bound by the Construction Loan Agreement, they generally agree they are subject to the trust deed and note. Further, all Investors who executed the Investors Agreement concede they are bound by it.

Finally, all Investors gave their respective contributions to Century Mortgage to fund the loan.

## II. Procedural Background

¶12    In September 2010, Borrowers filed suit against Investors.[6] Borrowers claimed Investors breached the Construction Loan Agreement and the integrated trust deed and note. They also brought claims regarding the implied covenant of good faith and fair dealing and unjust enrichment. Specifically, they claimed, "Investors expressly authorized Century Mortgage to act as the Investors' agent and to enter the [Construction] Loan Agreement with [Borrowers], and to service the loan on the Investors' behalf." Accordingly, Borrowers claimed, "Century Mortgage, on its own behalf and on behalf of all the Investors, entered into the [Construction] Loan Agreement and expressly agreed, among other things, that the net proceeds of the loan contemplated therein would be available for disbursement and application to the Project as appropriate requests were made." As such, Borrowers assert, "[Investors] breached and are in default of the [Construction] Loan Agreement and any other agreements ancillary thereto."[7]

---

6. In their complaint, Borrowers also brought claims against Century Mortgage and its principals individually, but those claims are not part of this appeal.

7. At the district court, three groups of investors answered Borrowers' complaint. The first group, the "VF Parties," was the largest and included more than eighteen investors represented by the same legal counsel. The second group was a married couple, Lyle and Barbara Stringham, referred to as the "Stringhams." Finally, the "HPI" group consisted of Harris Property Investments LLC and its principal, Paul Harris. To avoid further complicating the issues, we continue to refer to the

(continued…)

¶13    After discovery closed, between October 2012 and February 2013, the parties made various motions and counter-motions for summary judgment. To support their various motions, the parties raised four main issues: (1) whether Century Mortgage acted as Investors' agent or fiduciary, or as Borrowers' agent or fiduciary, or both; (2) whether Borrowers could demonstrate that Investors did not pay their respective shares, considering that Century Mortgage commingled the funds; (3) whether Investors were jointly and severally liable; and (4) whether Investors were unjustly enriched.

¶14    First, the parties raised several theories regarding Century Mortgage's agency. On one hand, Investors argued they had no duty under the Construction Loan Agreement because Century Mortgage did not have authority to sign the agreement on Investors' behalf. Rather, Century Mortgage acted as Borrowers' agent and fiduciary because Century Mortgage held Borrowers' loan funds, disbursed interest payments, and paid Village Bank to prevent it from foreclosing on the property. Investors alternatively argued that, even if Century Mortgage was their agent, Borrowers' claim still failed as a matter of law for at least two reasons: Century Mortgage's authority was limited to gathering information and preparing loan documents and, as Borrowers' fiduciary, it acted as a dual agent similar to an escrow agent. Accordingly, Investors argued that, under common law principles not yet adopted in Utah, Borrowers bore the risk of loss because Borrowers entered into a fiduciary relationship with Century Mortgage first. Further, Investors argued that any obligation Investors had to pay Borrowers was fulfilled under Utah Code section 22-1-2 when Investors gave Century Mortgage their funds because Century Mortgage was "a fiduciary."

---

(…continued)
various lenders as "Investors" collectively, particularly because each group has consistently incorporated the others' arguments.

¶15 On the other hand, Borrowers argued that "all of the relevant contracts and agreements establish that Century Mortgage was the express agent of the Investors." Moreover, Century Mortgage's involvement in putting together the loan transaction demonstrates it acted on behalf of Investors. They further reasoned that Century Mortgage already had a fiduciary relationship with those Investors who had previously invested with Century Mortgage, and Century Mortgage agreed to "look[] out for the interests of the Investors."

¶16 Second, Investors argued that Borrowers' claims were too speculative. They argued Borrowers could not point to a single investor and establish that the investor's funds were not already paid for Borrowers' benefit—especially considering that Investors' funds were commingled in Century Mortgage's bank account. Borrowers responded that "[b]ecause the Investors were co-venturers or joint venturers . . . , they are jointly and severally liable," which negated the requirement to point to a specific investor's breach. Then Borrowers pointed out that, because neither the Construction Loan Agreement nor the Investors Agreement had express joint and several liability covenants, the court should look to the parties' intentions.

¶17 Third, Borrowers argued that the Construction Loan Agreement, Investors Agreement, and the trust deed and note imposed joint and several liability because each investor made a promise involving the same performance—to lend $2.8 million. In contrast, Investors argued that each investor did not make the same promise as every other investor, but rather each promised to contribute a different amount, and therefore cannot be jointly liable. Further, Investors argued they could not be jointly liable because, even assuming they were bound by the Construction Loan Agreement, no investor had breached any part of that agreement.

¶18 Finally, Investors argued that an unjust enrichment claim was not proper as a matter of law because it "'is available *only* when no enforceable written or oral contract exists.'" (Quoting *Wood v. Utah Farm Bureau Ins. Co.*, 2001 UT App 35, ¶ 10, 19 P.3d

392.) In contrast, Borrowers argued that the unjust enrichment claim was appropriate against those investors who contend they are not bound by the Construction Loan Agreement.

¶19   In February 2013, after hearing arguments on the summary judgment motions, the court made determinations regarding the third and fourth issues. It concluded that "[t]he cause of action with respect to unjust enrichment is dismissed as to all the defendants," because it is "simply not legally sustainable to anyone except [those] who are not contracting parties." More importantly, the court also concluded that "there is . . . no legal justification to take these documents and create joint and several liability for [Investors]. They have a limited liability in this set of documents . . . . I don't find support in the documents or the law." In denying the motions regarding "the other issues," the court reasoned, "[W]ith respect to all the other motions for summary judgment going both directions, there's simply too much a conflict in fact for the Court to make any other ruling."

¶20   In the written ruling memorializing its decisions, the court concluded that "[i]n the event the Court determines that [Investors have] breached a duty to [Borrowers] which is the proximate cause of identifiable and specific damages, such damages are limited in that these [investors] may have individual liabilities up to the full amount of their contribution." The court later reiterated that this meant that Investors' liabilities would be capped at the amount the investors individually promised to contribute.

¶21   Investors again filed motions for summary judgment with evidence demonstrating that each individual investor had provided Century Mortgage with its respective portion of the loan. Borrowers opposed Investors' motions, arguing there were still a number of disputed questions that should have precluded summary judgment, including whether Investors were obligated to advance the loan to Borrowers through Century Mortgage under the Construction Loan Agreement.

¶22   The district court ultimately granted summary judgment in favor of Investors, dismissing all claims against them and awarding them their attorney fees. The court determined that, based on the pleadings, there was no dispute that Investors gave Century Mortgage the full amount each individual had agreed to contribute. But the court never made a determination regarding Century Mortgage's agency. Rather, the court concluded that Investors had no duty to pay any amount directly to Borrowers and, therefore, Borrowers could not recover damages from Investors, jointly or severally, even if they could prove Investors had a duty that was breached. Borrowers appeal.

ISSUES AND STANDARDS OF REVIEW

¶23   Borrowers contend the district court erred in granting Investors' motions for summary judgment. First, they argue that the "essential underpinning[] to the order" granting summary judgment is that "Century [Mortgage] collected, received, and held [Investors'] funds as the agent or fiduciary of [Borrowers], and not as the agent or fiduciary of [Investors]." Borrowers argue this "underpinning [is] wrong, both as a legal and factual matter."[8] Borrowers next argue that under the undisputed facts, "the law implies that [Investors] jointly promised a single performance to [Borrowers], i.e., a loan of $2,821,000 for the

---

8. Indeed, Borrowers argue the opposite is true. They argue that the district court "erred in failing to grant [their] Motion for Partial Summary Judgment [on the ground] that Century was the agent for [Investors]." They argue that the "contracts and undisputed conduct of the parties established, as a matter of law, that Century acted in the capacity as agent for [Investors], and not as agent for [Borrowers]." Because we reverse the court's decision to grant summary judgment in favor of Investors with regard to the agency issue, we need not address whether the court erred in denying Borrowers' competing summary judgment motion. *See infra* ¶¶ 25–36.

construction of the Project, and they are therefore jointly liable for the performance of the promise." Finally, Borrowers argue the court erred in limiting damages for which Investors could be liable. Specifically, they argue the "court's ruling on this point was procedurally improper" because there "is no legal basis" for this determination.

¶24 We review a "court's legal conclusions and ultimate grant or denial of summary judgment for correctness and view[] the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Orvis v. Johnson*, 2008 UT 2, ¶ 6, 177 P.3d 600 (citations and internal quotation marks omitted). Further, summary judgment is only appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(a). In other words, "[a] district court is precluded from granting summary judgment 'if the facts shown by the evidence on a summary judgment motion support more than one plausible but conflicting inference on a pivotal issue in the case . . . particularly . . . if the inferences depend upon subjective feelings or *intent*.'" *Uintah Basin Med. Ctr. v. Hardy*, 2008 UT 15, ¶ 19, 179 P.3d 786 (first omission in original) (quoting 73 Am. Jur. 2d *Summary Judgment* § 46 (2001)).

ANALYSIS

I. Agency

¶25 Borrowers argue that Investors breached their contractual duties under the Construction Loan Agreement. They can only demonstrate that Investors were bound by the terms of that agreement by showing that Century Mortgage entered into the contract on Investors' behalf, as their agent. But without reaching the merits of the parties' arguments regarding Century Mortgage's agency, we conclude that this issue should be remanded for further proceedings for two reasons: (1) the district court did not make a determination regarding Century Mortgage's agency and (2) Century Mortgage's agency is a

question of fact not proper for summary judgment because the inferences to be drawn from the facts are in dispute.

¶26 First, the district court never made a determination regarding agency. On appeal, the parties assume that the court implicitly decided the agency issue when it concluded that Investors no longer had a duty to pay after they deposited money into Century Mortgage's bank account. But, as Borrowers point out, there is an "absence of a stated rationale for the ruling" and "[n]either the transcript of the initial hearing on the motions, nor the transcript of the hearing on [Borrowers'] objection[s] . . . , shed much light on the judge's rationale."

¶27 As we have noted, the parties raised four main issues in their initial efforts to obtain summary judgment. But the court made determinations regarding only three of those issues. With regard to the first issue—the agency issue—the court denied the parties' motions, expressly stating "there's simply too much conflict in fact for the Court to make any other ruling."

¶28 Later, in the second round of summary judgment motions, the court made no comment and no determination when Borrowers raised the issue of Century Mortgage's agency. In their opposition memoranda, Borrowers averred that even if the "'objective facts are undisputed [that] does not mean that no genuine issues remain as to those facts.'" (Quoting *USA Power, LLC v. PacifiCorp*, 2010 UT 31, ¶ 33, 235 P.3d 749.) Then, they argued that Investors' arguments ignored "that Century Mortgage was the express agent of the [Investors]," and that "[a]ny inferences about the use of [Investors'] funds must be resolved in favor of [Borrowers], as the non-moving party."

¶29 At the hearing, Borrowers argued that evidence of money being deposited into Century Mortgage's bank account was not dispositive of the case. Borrowers conceded there was "no doubt that money went to [Investors'] agent," i.e., Century Mortgage. The real issue, Borrowers argued, was "what it means to contribute"—whether that means to contribute directly to Borrowers or whether the duty to contribute was satisfied when

Investors deposited their funds with Century Mortgage or authorized Century Mortgage to use funds it already held. Furthermore, Borrowers reiterated that whether Investors fulfilled the obligations under the Investors Agreement was irrelevant to this case, because the real issue was that Investors had an obligation to pay Borrowers according to the Construction Loan Agreement, trust deed, and note. They stated, "it's not of a moment to us that their agent squandered their money. Our contract is . . . not the Investor[s] Agreement."

¶30 Immediately after this argument, the court granted Investors' motions without any explanation, and without comment regarding Century Mortgage's agency. In its order, the court concluded that because Investors invested "the full amount required under the Investors Agreement,[9] they ha[d] no obligation to pay any additional sums to Century Mortgage, LLC, nor [did] they have a duty to pay any amount directly to [Borrowers]." Thus, although the court previously acknowledged that there was too much conflict in fact to rule on the agency issue, the court appears to have ignored Borrowers' arguments that the agency issue precluded summary judgment and the reminder that the Construction Loan Agreement controlled in this action, not the Investors Agreement.

¶31 Whether Century Mortgage acted as Investors' agent is crucial to this case: only if Century Mortgage acted as Investors' agent when it entered into the Construction Loan Agreement would Borrowers have a cause of action. Moreover, if Century Mortgage was Investors' agent, Investors' obligation to contribute to the loan may be a duty to Borrowers, not Century Mortgage. And even if the court implicitly made a finding that

---

9. The court's determination appears to be based on the terms of the Investors Agreement, not the Construction Loan Agreement upon which this case was brought. But because the court did not explain its determination, it is not clear upon which documents the court relied in making this determination.

Century Mortgage was Borrowers' agent, there is nothing in the record to determine which factual inferences the court drew in reaching its decision or how it came to that conclusion. Although we do not defer to the trial court's legal conclusions on summary judgment, "we certainly may derive great benefit from the trial judge's views on the issue and may be persuaded by those views." *Zions First Nat'l Bank, N.A. v. National Am. Title Ins. Co.*, 749 P.2d 651, 654 (Utah 1988). Accordingly, a trial court's failure to address an issue "provides ample justification for refusing to consider" that matter for the first time on appeal. *See id.*

¶32 Second, agency presents a question of fact that "depends upon all the facts and circumstances of the case." *See Gildea v. Guardian Title Co. of Utah*, 970 P.2d 1265, 1269 (Utah 1998); *accord Adamson v. United Mine Workers of Am.*, 277 P.2d 972, 973–74 (Utah 1954); *Vina v. Jefferson Ins. Co. of N.Y.*, 761 P.2d 581, 585 (Utah Ct. App. 1988); 3 Am. Jur. 2d *Agency* § 334 (2015). "A court can find that an agency relationship exists only if the agent is shown to have been acting on behalf and subject to the control of the principal." *Zions*, 749 P.2d at 654. This can be proved "by direct evidence of an express contract" or "by competent evidence which has a tendency to prove an agency." 3 Am. Jur. 2d *Agency* § 327 (2015). Thus, "[w]hen the facts relied upon to establish the existence of an agency relationship are conflicting, or conflicting inferences can be drawn from them, the question is one for the jury." *Id.*; *see also USA Power, LLC v. PacifiCorp*, 2010 UT 31, ¶ 65, 235 P.3d 749 (stating that "inferences drawn from circumstantial evidence . . . may create a genuine issue of material fact").

¶33 Here, although the parties do not contest the underlying facts of this case, they do dispute the inferences drawn from those facts. They dispute whether the facts demonstrate that Century Mortgage acted as Borrowers' agent or Investors' agent, or both. Borrowers support their argument by pointing to the express language of the Construction Loan Agreement and Investors Agreement, which states Century Mortgage acted "as agent for investors." But Investors argue the parties' conduct and the nature of the transaction demonstrate that Century

Mortgage acted as Borrowers' agent or, alternatively, as both Borrowers' and Investors' agent.

¶34    The parties also dispute the scope of Century Mortgage's agency. In particular, Borrowers argue that Century Mortgage acted on behalf of Investors, as their agent, when it entered into the Construction Loan Agreement. But Investors argue that, even if Century Mortgage was their agent, Century Mortgage did not have the "authority to sign the [Construction] Loan Agreement for them." They argue that "Century's role as agent for [Investors] was limited to arranging the [loan] and then as an escrow agent." To support this argument, Investors show that Century Mortgage's brochure, "How Century Mortgage Works," describes Century Mortgage as acting as an escrow agent.

¶35    More importantly, assuming Investors are bound by the terms of the Construction Loan Agreement, the parties dispute whether Century Mortgage's receipt of Investors' funds satisfies Investors' duties under the agreement. Investors argue that if Century Mortgage acted on behalf of Borrowers, as their agent, Century Mortgage's acceptance of the funds was equivalent to Borrowers accepting the funds. But Borrowers argue that, because Century Mortgage already had some Investors' funds and accepted funds from the remaining investors as an agent, Century Mortgage was essentially an extension of Investors and Investors' duties were not satisfied under the Construction Loan Agreement.

¶36    In light of the parties' disputes, we conclude that genuine issues of fact exist with respect to the questions of whose agent Century Mortgage was and the scope of its agency. *See USA Power*, 2010 UT 31, ¶ 33 (explaining that "[e]ven if the moving party's objective statement of the facts are agreed upon, reasonable inferences made from those undisputed facts can indeed create a genuine issue of material fact"). We therefore vacate the order granting summary judgment and remand the issue of Century Mortgage's agency for further proceedings.

## II. Joint and Several Liability

¶37 Borrowers contend that Investors "were jointly and severally liable for the performance of their collective obligations under the [Construction Loan Agreement, trust deed, and note]." Specifically, they argue that Investors "jointly promised a single performance to [Borrowers], i.e., a loan of $2,821,000 for the construction of the Project, and they are therefore jointly liable for the performance of the promise to deliver the total amount." Borrowers reason that "it makes practical sense that [Borrowers] contracted for a complete loan, not for many separate loans." Investors disagree. They contend they are not jointly liable because each Investor "did not promise the same performance." Investors argue that this is demonstrated by the plain language of the loan documents in which Investors' names are "listed together with the amount or percentage of their investment compared to the entire amount loaned to [Borrowers]." Rather, Investors argue, the loan was "essentially a syndicated loan where the investors are only severally liable."

¶38 "Whether or not multiple promises have reference to the same performance is entirely a question of interpretation." Restatement (Second) of Contracts ch. 13, intro. note (Am. Law Inst. 1981).

> The basic rule of contract interpretation is that intent of the parties is to be ascertained from the content of the instrument itself, the rationale for the rule being to preserve the sanctity of written instruments. Each contract provision is to be considered in relation to all of the others, with a view toward giving effect to all and ignoring none. It is only when ambiguity exists which cannot be reconciled by an objective and reasonable interpretation of the contract as a whole that resort may be had to the use of extrinsic evidence.

*Utah Valley Bank v. Tanner*, 636 P.2d 1060, 1061–62 (Utah 1981) (citations omitted). "A contract . . . is ambiguous if it is capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies." *Peterson v. Coca-Cola USA*, 2002 UT 42, ¶ 9, 48 P.3d 941 (citation and internal quotation marks omitted).

¶39    "Whether an ambiguity exists in a contract is a question of law." *WebBank v. American Gen. Annuity Serv. Corp.*, 2002 UT 88, ¶ 22, 54 P.3d 1139 (citation and internal quotation marks omitted). "When ambiguity exists, the intent of the parties becomes a question of fact." *Id.* (citation and internal quotation marks omitted). Thus, "[a] motion for summary judgment may not be granted if a legal conclusion is reached that an ambiguity exists in the contract and there is a factual issue as to what the parties intended." *Id.* (citation and internal quotation marks omitted).

¶40    At the close of the first summary judgment hearing, the district court stated that there was "no legal justification to take these documents and create joint and several liability for [Investors]. They have a limited liability in this set of documents according to their percentage." It then concluded, "[T]here is no basis in fact or law for finding joint and several liability of [Investors]." We must therefore determine whether the court's interpretation of the Construction Loan Agreement—the operative document—was proper insofar as it explicitly determined that as a matter of law Investors are not jointly and severally liable for any breach in the agreement, and insofar as it implicitly determined that the language of the agreement was unambiguous.

¶41    As a general rule, "[w]here two or more parties to a contract promise the same performance to the same promisee, each is bound for the whole performance [of the contract], whether his duty [is expressed as] joint, several, or joint and several." Restatement (Second) of Contracts § 289 (Am. Law Inst. 1981). "Unless a contrary intention is manifested, a promise by two or more promisors" is presumed to be joint. *Id.* § 288(2)

& cmt. c. This is the consistent view of the various treatises on contract law and the Restatement (Second) of Contracts. *See, e.g.*, *Id.* §§ 288, 289; 12 Williston on Contracts, § 36:1, 800–01 (4th ed. 2012). "A several obligation, by contrast, has the effect of creating two separate liabilities on a single contract." 12 Williston on Contracts, § 36:1, 802 (4th ed. 2012). Accordingly, "when a several obligation is entered into by two or more parties in one instrument, it is the same as though each has executed separate instruments. Under these circumstances, each party is bound separately for the performance which it promises and is not bound jointly with anyone else." *Id.* at 802–03 (citations omitted). "Finally, a joint and several contract is a contract made by the promisee with each promisor and a joint contract made with all the promisors, so that parties having a joint and several obligation are bound jointly as one party, and also severally as separate parties at the same time." *Id.* at 803 (citations omitted).

¶42 The Construction Loan Agreement states:

THIS AGREEMENT, is made on <u>April 26, 2010 </u>by and between the undersigned <u>Telegraph Towers LLC., Jared Christiansen and Bradley Harrell individually (borrower)</u> and Century Mortgage, as agent for investors Jean Rankin Trust, 3.08% interest; Doloryce Foster, 1.24% interest; Ray Schmutz Family Trust, 2.80% interest; Hanson Family Trust, 1.77% interest; Charles and Lorena Lambert, 0.92% interest; Lorena Lambert, 3.54% interest; EJ Foremaster Family Trust, 1.95% interest; Lane and Marian Foote, 0.71% interest; The Albert Leroy Warner Trust, 0.53% interest; Ray Schmutz Family Partnership, 6.17% interest; Peacock Revocable Trust, 6.59% interest; Lanyle Brown, 1.03% interest; Cox Revocable Trust, 0.82% interest; Donald Carlyle Whitaker Revocable Living Trust, 2.48% interest; Jack W and Denise M Doxey, 1.77% interest; Layne and Nancy Johnson, 1.77% interest; Lyle and Barbara Stringham, 1.77% interest; Kimberly Meredith, 0.43% interest; Jenni Meredith,

0.71% interest; The Ludlow Trust, 3.58% interest; G. Dustin Gillman, 7.09% interest; CTTZ Inv. Defined Benefits Pension Plan, 7.09% interest; IRA Express Inc, FBO Leland Laub, 3.51% interest; Robert Ludlow, 1.77% interest; Delmer Harris, 0.71% interest; Tiffany Meredith, 0.71% interest; Harris Property Investments LLC, 21.27% interest; L Warren Cox Living Trust, 3.54% interest; Richard Burch, 3.54% interest and Bradley S Harrell,[10] 7.09% interest inconsideration of the granting of a loan by lenders and as part of said loan transaction, which loan is evidence by Note of the undersigned for <u>$2,821,00.00 at 12% interest</u> dated <u>April 26, 2010</u>.

Attached hereto and by this reference made part thereof, in favor of the Lenders, and secured by a first Trust Deed on real property . . . .

The purpose of said loan is to finance a part of the cost of construction of certain improvements upon the described premises in accordance with plans and specifications that have been or will be deposited by Borrower with the Lenders. The parties desire to set forth the terms and conditions of this transaction, the agreement of the Parties, and the rights and remedies of the Lenders, in connection with the disbursement of the proceeds and construction of the improvements.

¶43    Borrowers argue that because there are multiple parties to the Construction Loan Agreement making the same promise—to fund the $2.8 million loan—it is presumed that Investors are jointly liable. Restatement (Second) of Contracts § 288(2) & cmt.

---

10. Harrell, one of the Borrowers, also apparently invested in the Project through Century Mortgage.

c; *see also* 12 Williston on Contracts, § 36:1, 800–01 (4th ed. 2012). We disagree.

¶44   The plain language of the agreement demonstrates that Investors did not each promise the same *performance* to the same promise. Rather, each investor promised to contribute a fraction of the $2.8 million loan. Specifically, after each investor's name the agreement indicates the portion of the loan that investor is associated with by listing the percent of interest to which the investor is entitled.[11] Considering the contract as a whole, to determine that Investors each promised to pay the $2.8 million loan would require us to ignore the interest percentages associated with each individual investor. *See Utah Valley Bank v. Tanner*, 636 P.2d 1060, 1061–62 (Utah 1981) (citations omitted). Indeed, this agreement harmonizes with the Restatement's definition of a several obligation, which states that "promises to subscribe for a common purpose sums of money set opposite the names of the promisors are ordinarily promises of separate performances." Restatement (Second) of Contracts § 288 cmt. c (Am. Law Inst. 1981). Accordingly, we cannot agree with Borrowers that the Construction Loan Agreement imposes joint or joint and several liability on Investors. Rather, Investors' liability is several because they promised separate performances, as indicated by the percentages identified next to their names in the agreement. On this issue, we affirm the district court.

---

11. We also note the Investors Agreement states that Investors "[a]gree to fund a loan request by <u>Telegraph Towers LLC, Jared Christiansen and Bradley Harrell</u> in the amounts shown [opposite their names]." Next to each investor's name is the percentage and dollar amount of their investment and a corresponding dollar amount of interest for which they are entitled.

### III. Damages

¶45 Borrowers argue the district court erred by ruling that the total amount of all possible damages for a breach of contract or breach of the implied covenant of good faith and fair dealing was limited to the amount of money each individual investor promised to pay under their contract. We agree.

¶46 An injured party has "a right to damages for any breach by a party against whom the contract is enforceable unless the claim for damages has been suspended or discharged." *Id.* § 346(1). "Contract damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of his bargain by awarding him a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed." *Id.* § 347 cmt. a. These damages can "include both general damages, *i.e.*, those flowing naturally from the breach, and consequential damages, *i.e.*, those reasonably within the contemplation of, or reasonably foreseeable by, the parties at the time the contract was made." *Billings v. Union Bankers Ins. Co.*, 918 P.2d 461, 466 (Utah 1996) (citation and internal quotation marks omitted).

¶47 The Utah Supreme Court has consistently recognized that "in appropriate circumstances, consequential damages for breach of contract may reach beyond the bare contract terms," *id.* (citation and internal quotation marks omitted); *accord Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 801–02 (Utah 1985), and therefore a claimant's award of "damages for breach of contract may reach beyond the bare contract terms," *Beck*, 701 P.2d at 801; *see also Bevan v. J.H. Constr. Co.*, 669 P.2d 442, 444 (Utah 1983) (holding that "the loss of a favorable mortgage interest rate is a legitimate item of compensable damage"); *Pacific Coast Title Ins. Co. v. Hartford Accident & Indem. Co.*, 325 P.2d 906, 908 (Utah 1958) (holding that attorney fees are a reasonably foreseeable consequential damage for defending a contractor's default). This proposition "is wholly consistent with the general rule of damages which arms the trial court with the discretion to place the litigants as nearly as possible in the position they would

have enjoyed had the contract not been breached." *Bevan*, 669 P.2d at 444. The recoverability of consequential damages turns on a three-prong analysis. "[T]o recover consequential damages in a breach of contract action, a claimant must (1) prove that he *in fact* has such damages, (2) establish the *amount* of such damages with reasonable certainty, and (3) show that such damages were within the *contemplation* of the parties at the time of contracting." *Castillo v. Atlanta Cas. Co.*, 939 P.2d 1204, 1209 (Utah Ct. App. 1997).

¶48     In applying the foregoing rules to this case, it is clear the district court incorrectly ruled that Borrowers' damages are limited. We do not decide whether consequential damages are appropriate in this scenario. We instead conclude that the court must analyze Borrowers' damages in the context of this three-prong test, which implicitly requires the court to determine the extent of Investors' breach, before limiting damages.

¶49     Here, the court never reached the issue of whether Investors breached the Construction Loan Agreement. It simply determined that Investors were not jointly and severally liable for any breach. Then it stated,

> In the event the Court determines that [Investors have] breached a duty to [Borrowers] which is the proximate cause of identifiable and specific damages, such damages are limited in that these defendants may have individual liabilities up to the full amount of their contribution, if they have contributed less than their contribution as shown, as their percentage of the total $2.8 million loan for the project at issue in this matter.

Borrowers opposed this language and requested a hearing to reconsider it. Borrowers argued that this ruling misstated the court's oral conclusion at the first summary judgment hearing. Further, they argued that the court's determination regarding joint and several liability "did not address the quantum of

damages for which a lender/investor might be held liable, but merely whether all of the lenders/investors were jointly and severally liable." In essence, Borrowers argued that the court's ruling was improper to the extent that it purports to limit Investors' responsibility for damages to the amounts that they were individually responsible to contribute under the terms of the Construction Loan Agreement.

¶50    The court held a hearing to address this issue. Borrowers argued that consequential damages could reach beyond the bare terms of the Construction Loan Agreement and it was "an issue [that would] be hammered out in trial" by applying the three-prong analysis for consequential damages. But the court did not respond to that argument and instead suggested that it might be more appropriate for Borrowers to file an interlocutory appeal to "see if [he] was right." Specifically, the judge stated,

> I want your clients to think about this, because we might have to just suspend this action here, let the Court of Appeals, or the Supreme Court if they're willing to keep it, take a look at this and see if my ruling was correct and there is a 2.8 million cap. . . .
>
> [W]e might have to just stop this case here and take it up on appeal to see if I am right or wrong about this kind of limit. . . .
> If I can be corrected, that's your job, and I expect you to [appeal] it. . . . I want to know what the law is myself.

¶51    The court later explained that Borrowers should be entitled to recover from an investor who "promised to put $15,000 into the project and only put in five." The court ultimately concluded it was "still convinced that the order prepared by [Investors] is the order that's going to be signed by the Court," but it never explained why. We therefore reverse the court's limitation of damages and remand this issue for further fact-finding.

IV. Attorney Fees

¶52    Investors argue that "because [they] were awarded their fees below, they are entitled to their fees on appeal." "'[W]hen a party who received attorney fees below prevails on appeal, the party is also entitled to fees reasonably incurred on appeal.'" *Macris v. Sevea Int'l, Inc.*, 2013 UT App 176, ¶ 53, 307 P.3d 625 (alteration in original) (quoting *Valcarce v. Fitzgerald*, 961 P.2d 305, 319 (Utah 1998) (plurality opinion)). Because Investors prevailed below and successfully defended the joint and several liability issue on appeal, they are entitled to an award of attorney fees incurred on appeal for that issue. Because they prevailed only in part on appeal, we reverse the district court's award of attorney fees below except with respect to the issues on which they succeeded on appeal. Further, we remand this issue to the district court for a determination of the appropriate amount of attorney fees and costs incurred with regard to the joint and several liability issue. *See id.*

CONCLUSION

¶53    In sum, we affirm the district court's determination that Investors are not jointly and severally liable for any breach of the Construction Loan Agreement. But we conclude that Century Mortgage's agency is a question of fact improper for summary judgment. Thus, Century Mortgage's agency and the scope of that agency are questions for the jury. Moreover, because the court failed to address whether Investors breached the Construction Loan Agreement and consequently failed to determine whether that breach resulted in consequential damages by analyzing the facts of this case under the relevant three-prong test, we further conclude the court erred in limiting damages. Finally, we grant Investors' request for attorney fees for prevailing on the issue of joint and several liability only. We therefore reverse and remand this case for further proceedings.

_____