**2018 UT App 234**

## THE UTAH COURT OF APPEALS

LUKE D. JEPPESEN,
Appellee,
*v.*
BANK OF UTAH, HARRY MCMURDIE, AND SHIRA MCMURDIE,
Appellants.

Opinion
No. 20170062-CA
Filed December 20, 2018

Fourth District Court, Provo Department
The Honorable Christine S. Johnson
No. 150401095

John D. Luthy and Marty E. Moore, Attorneys
for Appellants

Bryan H. Booth and John W. Mann, Attorneys
for Appellee

JUDGE DIANA HAGEN authored this Opinion, in which
JUDGES GREGORY K. ORME and RYAN M. HARRIS concurred.

HAGEN, Judge:

¶1     Bank of Utah, Harry McMurdie, and Shira McMurdie (collectively, the McMurdies) appeal the district court's grant of summary judgment in favor of Luke D. Jeppesen (Jeppesen). In 2001, Jeppesen's father, Zane Jeppesen (Zane), persuaded Harry McMurdie (Harry) to invest $500,000 in a real estate project in exchange for a promissory note secured by a trust deed to real property Zane owned in Utah County (the Alpine Property). Zane defaulted on the note in 2003, but negotiated three subsequent agreements promising to pay the McMurdies by an extended due date. Many years later, the

McMurdies foreclosed on the Alpine Property, which Zane had since conveyed to his son through a quitclaim deed.

¶2 Jeppesen brought a quiet title action. On cross-motions for summary judgment, the district court ruled that the six-year statute of limitations barred the nonjudicial foreclosure sale of the Alpine Property. Because we determine that there were genuine issues of material fact as to whether (1) the 2001 Note was extended or superseded by the subsequent agreements, and (2) Jeppesen was estopped from asserting the statute of limitations as a defense, we conclude the district court erred in granting summary judgment. Accordingly, we reverse and remand.

BACKGROUND

¶3 Between 1998 and 2004, Zane worked as an agent of Beverly Hills Development Corporation, a real estate development company engaged in a widespread fraud scheme (the Beverly Hills project). During that time, Zane acquired a total of 134 Utah investors for the Beverly Hills project, raised approximately $8 million, and earned nearly $1 million in compensation. Most of the investments offered or sold by Zane took the form of unsecured promissory notes. In some cases, however, the promissory notes sold to investors were secured by trust deeds recorded against the Alpine Property. This case concerns the nonjudicial foreclosure sale of the Alpine Property by one of those investors.

¶4 Harry had known Zane for several decades. In 2001, Zane approached Harry about investing in the Beverly Hills project. Zane assured him that his investment would be secured by a first-position trust deed on the Alpine Property, a five-acre parcel which Zane claimed was worth $500,000 per acre.

¶5 Harry agreed to invest some of his retirement funds held by the Bank of Utah (the McMurdie IRA) in the project. On September 24, 2001, Zane personally executed a promissory note for a $500,000 loan from the McMurdie IRA, secured by two trust deeds[1] recorded against the Alpine Property (collectively, the 2001 Note). The 2001 Note required Zane to make monthly payments of $5,000, with the entire unpaid principal and twelve percent interest due on March 24, 2003. The 2001 Note provided that "the makers, sureties, guarantors and endorsers hereof . . . consent to any and all extensions of time, renewals, . . . or modifications that may be granted by the holder hereof with respect to the payment or other provisions of this note."

¶6 From October 2001 through March 2003, Zane made regular payments of $5,000 per month to the McMurdie IRA. But on the maturity date of the 2001 Note, Zane executed a new promissory note (the 2003 Note). The 2003 Note stated that the full principal and interest would be due on March 24, 2004. Zane did not create a new trust deed, but the 2003 Note listed the Alpine Property as the "Property Address."

¶7 From April 2003 through March 2004, Zane made payments to the McMurdie IRA. When the maturity date on the 2003 Note arrived, Zane executed two new promissory notes, one for the original $500,000 investment and a second for $200,271.11 in interest already due and owing on the original debt (collectively, the 2004 Notes). The 2004 Notes stated that "a Mortgage, Deed of Trust or Security Deed . . . dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in the Note." Again, Zane did not record a new trust deed, but the 2004 Notes listed the Alpine Property as the "Property Address."

---

1. The second trust deed is identical to the first and appears to have been inadvertently recorded.

The 2004 Notes stated that the full principal and interest would be due on March 24, 2005.

¶8     In early 2005, Zane was charged with two counts of securities fraud, two counts of dealing unregistered securities, and two counts of sale by an unauthorized agent based on his work for the Beverly Hills project. He pled no contest and entered into a Stipulation and Consent Order with the Utah Division of Securities, restricting his ability to deal in securities, prohibiting further fraudulent conduct, and requiring him to pay a fine.

¶9     In September 2005, Zane filed for bankruptcy. The McMurdies were aware of the bankruptcy filing, but they did not challenge the discharge of Zane's underlying debt and did not seek relief from the automatic stay so as to commence foreclosure proceedings at that time. *See generally* 11 U.S.C. § 362 (2012). Zane assured Harry that "he had gone to considerable expense with an attorney to carve . . . [the Alpine Property] and [the McMurdies'] note out of the bankruptcy" so the McMurdies were still "safe with these instruments" and could "plan on being repaid." On December 14, 2005, the bankruptcy court entered an order of discharge for Zane, extinguishing his personal liability for the debt.[2] Although not evident from the

_____

2. Ordinarily, a secured creditor "is not limited to foreclosure on the mortgaged property should the debtor default on his obligation; rather, the creditor may in addition sue to establish the debtor's in personam liability for any deficiency on the debt and may enforce any judgment against the debtor's assets generally." *Johnson v. Home State Bank*, 501 U.S. 78, 82 (1991) (italics omitted). A discharge in bankruptcy "extinguishes only 'the personal liability of the debtor.'" *Id.* at 83 (quoting 11 U.S.C. § 524(a)(1) (2012)). But "a creditor's right to foreclose on the mortgage survives or passes through the bankruptcy." *Id.*

record, the bankruptcy trustee apparently abandoned the bankruptcy estate's interest in the Alpine Property, presumably because the secured interests exceeded the value of the property.[3]

¶10 Several years later, unbeknownst to the McMurdies, Zane executed and recorded a quitclaim deed, conveying his interest in the Alpine Property to his son, Jeppesen.

¶11 In 2011, aware that the repayment deadline under the 2004 Notes had passed on March 24, 2005 and that a six-year statute of limitations had begun to run from that date, Harry approached Zane to discuss the outstanding debt. The parties executed two documents extending the maturity date of the 2004 Notes to March 24, 2013 (collectively, the 2011 Modification Agreement). These documents indicate that the "Start Date of [the] Original Contract" was "24 September 2001," the date of the 2001 Note. The recitals explain that the 2001 Note was secured by two trust deeds, which "remain liens of record against" the Alpine Property, and that "the parties hereto desire to enter into this Modification Agreement for the purpose of . . . memorializing the terms by which the [trust deeds] will be released." The 2011 Modification Agreements include an "Extension of the Maturity Date" to March 24, 2013. The parties signed

---

3. "Property of the debtor in which a creditor has a security interest becomes property of the debtor's bankruptcy estate subject to the lien or encumbrance, even where the lien or encumbrance equals or exceeds the fair market value of the property and the debtor, therefore, lacks equity in the property." 9A Am. Jur. 2d *Bankruptcy* § 1243 (2018). "Encumbered property remains in the estate until the secured creditor obtains relief from the automatic stay to proceed against the property or until the property is abandoned from the estate by the trustee." *Id.*

the agreements on March 22, 2011, two days before the statute of limitations was to run on the McMurdies' claims.

¶12     When the maturity date of the 2011 Modification Agreements approached, Zane and Harry agreed to extend the maturity date by another three months (the 2013 Extension Agreements). The 2013 Extension Agreements again list the start date of the original contract as "24 September 2001" and set a new maturity date of June 24, 2013. Zane testified that the purpose of the document was "[t]o keep Harry McMurdie from foreclosing for three more months."

¶13     When Zane failed to pay the principal and accrued interest by June 24, 2013, the McMurdies initiated nonjudicial foreclosure proceedings against the Alpine Property. A foreclosure sale was held on July 23, 2015, and a trustee's deed conveying the property to the McMurdie IRA was recorded on July 28, 2015. Jeppesen filed this quiet title action one day before the foreclosure sale.

¶14     Jeppesen argued that the six-year statute of limitations barred the nonjudicial foreclosure sale because the last payment on the 2001 Note was received on March 18, 2004. On cross-motions for summary judgment, the district court ruled that the statute of limitations barred the McMurdies' foreclosure sale and granted summary judgment in favor of Jeppesen. The McMurdies appeal.

STANDARD OF REVIEW

¶15     In reviewing a grant of summary judgment, "we accord no deference to the [district] court, but review its conclusions for correctness." *McNair v. Farris*, 944 P.2d 392, 394 (Utah Ct. App. 1997) (quotation simplified).

ANALYSIS

¶16    On appeal, the McMurdies argue that the district court erred in granting summary judgment in favor of Jeppesen on the basis of the statute of limitations. Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Utah R. Civ. P. 56(a). At the summary judgment stage, the district court must "view all facts and reasonable inferences in the light most favorable to the nonmoving party." *Pugh v. Dozzo-Hughes*, 2005 UT App 203, ¶ 26, 112 P.3d 1247. Under this standard, "a district court is precluded from granting summary judgment if the facts shown by the evidence on a summary judgment motion support more than one plausible but conflicting inference on a pivotal issue in the case," especially if the inferences depend upon the parties' intent. *Telegraph Tower LLC v. Century Mortg. LLC*, 2016 UT App 102, ¶ 24, 376 P.3d 333 (quotation simplified).

¶17    The McMurdies advance two alternative arguments for reversal. First, the McMurdies claim that there is a material issue of fact as to whether the parties' subsequent agreements extended the maturity date of the 2001 Note to June 24, 2013, so that the statute of limitations did not begin to run until that date. Alternatively, the McMurdies contend that there is a genuine issue of material fact as to whether Zane induced Harry to forgo initiating the foreclosure within the limitation period and whether Jeppesen should be estopped from asserting the statute of limitations based on his father's actions. We agree that there are material issues of fact on both issues that preclude summary judgment.

## I. Issues of Fact Regarding Extension of the 2001 Note

¶18    The first issue on appeal is whether there are material questions of fact as to when the statute of limitations began to

run on the McMurdies' foreclosure cause of action. The nonjudicial foreclosure sale of the Alpine Property was based on the trust deeds securing the 2001 Note. "A trust deed secures the obligations due under a note by transferring a security interest in real property to a trustee to be held until the debt is repaid." *DiMeo v. Nupetco Assocs., LLC*, 2013 UT App 188, ¶ 7, 309 P.3d 251. "In other words, the pledged property is used as collateral for the obligation and can be foreclosed in the event of default." *Id.* An action to foreclose the trust deed must be commenced "within the period prescribed by law for the commencement of an action on an obligation secured by a trust deed." Utah Code Ann. § 57-1-34 (LexisNexis Supp. 2018).

¶19 Here, because the trust deeds secured the 2001 Note, the parties agree that the six-year limitations period applies for actions "upon any contract, obligation, or liability founded upon an instrument in writing." *Id.* § 78B-2-309(2) (2012).[4] The statute of limitations begins to run "when the contract was breached— that is, the date of the first missed payment, or upon the maturity date of the loan, if no action has been taken to accelerate payment prior to that date." *See Goldenwest Fed. Credit Union v. Kenworthy*, 2017 UT App 191, ¶ 7 n.4, 406 P.3d 253 (citation omitted).

¶20 In granting summary judgment, the district court concluded that the statute of limitations began to run on March 18, 2004, the date the last payment was received by the McMurdies. Accordingly, the court ruled that the six-year statute of limitations had long since run when the trustee's sale

---

4. Neither side has argued that the six-year statute of limitations for negotiable instruments under the Uniform Commercial Code applies, which has potentially different triggering dates. *Cf. Deleeuw v. Nationstar Mortgage LLC*, 2018 UT App 59, ¶ 12, 424 P.3d 1075.

occurred in 2015. In a subsequent order, the court rejected the McMurdies' argument that the subsequent agreements had the effect of extending or renewing the 2001 Note.[5]

¶21   Whether the subsequent agreements extended the 2001 Note secured by the trust deeds is a question of fact for trial. A new note does not "extinguish the debt for which the original note was given unless it clearly appears that it was the intention of the parties that the execution of the new note and the cancellation of the old note should extinguish the debt represented by the old note." *First Sec. Bank of Utah v. Proudfit Sporting Goods Co.*, 552 P.2d 123, 124 (Utah 1976) (quotation simplified).

¶22   In this case there is conflicting evidence regarding the parties' intent. As the district court noted, the 2011 Modification Agreement states that the "2001 Note was replaced and superseded by" the 2004 Notes. The court also noted that the 2004 Notes "substitute different parties (Harry and Shira McMurdie and the McMurdie Family Trust in lieu of the

---

5. The McMurdies did not raise this argument initially because they had elected to void all agreements that followed the 2001 Note on the basis of fraud, thereby avoiding a provision in the 2011 Modification Agreements that might have released any securities fraud claims against Zane. In a motion to revise or vacate the court's summary judgment ruling, the McMurdies reversed their prior position and elected to ratify the 2003 Note, 2004 Notes, and the 2011 Modification Agreement. Although it would have been well within the district court's discretion to refuse to entertain the argument based on the McMurdies' belated change of heart, the court chose to address it on the merits. The court declined to revisit its summary judgment ruling only after concluding that the McMurdies could not prevail on the merits of their alternative argument.

McMurdie IRA) as well as different amounts (the $200,271.11 interest which had accrued on the 2001 Note) and different interest rates (sixteen percent compounded in lieu of twelve percent)." This evidence supports the district court's conclusion that the subsequent agreements were "new obligations which supersede and satisfy the 2001 Note."

¶23    However, the McMurdies also presented ample evidence to support the opposite conclusion. The 2001 Note provided that it could be extended or renewed by the parties. According to Harry's affidavit, at Zane's request, he agreed to "extend" his investment when the 2001 Note was due to expire in March 2003. Although Harry invested no additional money, Zane executed a second promissory note for $500,000, listing the Alpine Property secured by the trust deeds and setting a new due date of March 24, 2004. The content of the 2003 Note and the circumstances surrounding it could support a finding that it was intended to extend by one year the due date of the 2001 Note secured by the trust deeds.

¶24    Harry explained that when the new due date arrived, Zane again proposed that he "extend the debt on the original $500,000 promissory note investment by one year." Zane executed two more promissory notes, one for the $500,000 principal invested in 2001 and one for the interest that had accrued since 2001. These 2004 Notes stated that they were secured by "a Mortgage, Deed of Trust or Security deed." Although no new trust deed was recorded, the 2004 Notes again listed the Alpine Property. In his own testimony, Zane confirmed that the 2004 Notes were "extending" his debt to the McMurdies. The extension of the due date by exactly one year, the promise to pay both the original principal of $500,000 plus the interest accrued since 2001, the representation that the note was secured, the reference to the Alpine Property, and the testimony of both parties all support the conclusion that the 2004

Notes were intended as a further extension of the 2001 Note secured by the trust deeds.

¶25    Finally, the evidence regarding the 2011 Modification Agreement supports a finding that it was intended to extend the 2001 Note. The 2011 Modification Agreement explains that the trust deeds securing the 2001 Note remain liens of record against the Alpine Property even though Zane's personal liability for the debt had been discharged in bankruptcy. It further states that in the event of a default, "the sole recourse of the McMurdies is a non-judicial foreclosure against the Secured Property." The 2011 Modification Agreement states that it is for the express "purpose of modifying, extending and changing the terms of the 2004 Notes and memorializing the terms by which the [2001 trust deeds] will be released" and includes an "Extension of the Maturity Date" of the 2004 Notes to March 24, 2013. Because only the 2001 Note was expressly secured by a trust deed, the acknowledgement that the McMurdies' investment remains secured by the Alpine Property is strong evidence that the 2011 Modification Agreement and the intervening notes were intended as extensions of the original secured debt.

¶26    In addition, the 2011 Modification Agreement was signed two days before the six-year statute of limitations period would have expired based on the prior maturity date. The final page, titled "Contract Extension Agreement," lists the start date of the original contract as "24 September 2001"and expressly states, "The intent of this contract is to continue with an extension from the last two contracts that were dated 24 March 2004 and were to mature on 24 March 2005." Based on this plain language and the surrounding circumstances, a fact-finder could reasonably conclude that the prior written instruments—the 2003 Note and the 2004 Notes—were intended as an extension of the original 2001 Note and that the 2011

Extension Agreement⁶ was intended to "continue" that extension before the statute of limitations elapsed.

¶27 There are material issues of fact precluding summary judgment in this case. If the parties intended the subsequent agreements to extend—rather than supersede—the 2001 Note secured by the trust deeds, the statute of limitations would have been triggered when Zane failed to pay the debt by the extended maturity date of March 24, 2013, in which case the 2015 foreclosure action would be timely. Because the parties' intent is a disputed and material question of fact, the application of the statute of limitations cannot be resolved on summary judgment. Accordingly, we vacate the district court's order and remand for trial or such other proceedings that may now be appropriate.

## II. Issues of Fact Regarding Equitable Estoppel

¶28 The McMurdies separately contend that the district court erred in granting summary judgment because a question of fact remains concerning whether Jeppesen is estopped from asserting the statute of limitations. Specifically, the McMurdies argue that genuine issues of material fact exist as to whether Zane fraudulently induced Harry to forego timely initiating a foreclosure sale and whether that conduct can be imputed to Jeppesen.

---

6. It is unnecessary to consider the effect of the 2013 Extension Agreements because the foreclosure sale occurred within six years of the maturity date set in the 2011 Modification Agreement. But the 2013 Extension Agreements, which also listed the original contract date as "24 September 2001," as well as Zane's testimony that the purpose of that agreement was "[t]o keep Harry McMurdie from foreclosing for three more months," may provide additional evidence of the parties' intent to extend the original obligation.

¶29    The McMurdies framed this issue below as an application of the "equitable discovery rule," and the court addressed it in those terms. On appeal, however, the McMurdies' argument is based on the "equitable estoppel doctrine." The McMurdies maintain that they adequately preserved this argument by providing the district court "with legal authority for the equitable estoppel argument they make here." Jeppesen does not dispute this assertion, and instead concedes that "the equitable estoppel argument asserted by [the McMurdies] is a part of the equitable discovery rule asserted by [the McMurdies] before the district court." While we acknowledge that the two concepts are related and accept the parties' agreement as to preservation, we take this opportunity to distinguish the two doctrines.

¶30    Under the equitable discovery rule, a statute of limitations "may be tolled until the discovery of facts forming the basis for the cause of action." *Russell Packard Dev., Inc. v. Carson*, 2005 UT 14, ¶ 21, 108 P.3d 741 (quotation simplified). In other words, "the equitable discovery rule may operate to toll an otherwise fixed statute of limitations if a plaintiff does not discover the cause of action due to the defendant's concealment or misleading conduct or due to other exceptional circumstances that would make the application of the limitations period unjust." *Young Res. Ltd. P'ship v. Promontory Landfill LLC*, 2018 UT App 99, ¶ 27, 427 P.3d 457.

¶31    In granting Jeppesen's motion for summary judgment, the district court ruled that the equitable discovery rule did not apply. The district court acknowledged that "[t]he McMurdies may have been persuaded not to file a claim or seek foreclosure" due to a "string of acts, primarily on the part of Zane Jeppesen, which convinced the McMurdies that their investment was safe and they would receive payment." Nevertheless, the court ruled that the discovery rule did not apply because the McMurdies "were fully aware that Zane Jeppesen was in default" and were "aware that they could" file a claim. Because the McMurdies

could not make the initial showing that they "did not know and could not reasonably have known of the existence of a cause of action in time to file a claim within the limitation period," the court ruled that neither the concealment prong nor the exceptional circumstances prong of the discovery rule tolled the statute of limitations.

¶32 In reaching this conclusion, the district court did not apply the related doctrine of equitable estoppel. The doctrine provides:

> Unlike equitable tolling, which is invoked in cases where the plaintiff is ignorant of his cause of action because of the defendant's fraudulent concealment, equitable estoppel is invoked in cases where the plaintiff knew of the existence of his cause of action but the defendant's conduct caused him to delay in bringing his lawsuit.

*Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 802 (2d Cir. 2014) (quotation simplified). Equitable estoppel prevents a party from "lull[ing] an adversary into a false sense of security thereby subjecting his claim to the bar of limitations, and then be heard to plead that very delay as a defense to the action when brought." *Rice v. Granite Sch. Dist.*, 456 P.2d 159, 163 (Utah 1969). In other words, "where the delay in commencing an action is induced by the conduct of [one party], or his privies . . . [the delay] cannot be availed of by [that party or his privies] as a defense." *Id.*

¶33 To estop a defendant from asserting the statute of limitations as a defense, a plaintiff must establish three elements:

> (1) a statement, admission, act, or failure to act by one party inconsistent with a claim later asserted;
> (2) reasonable action or inaction by the other party

taken on the basis of the first party's statement, admission, act, or failure to act; and (3) injury to the second party that would result from allowing the first party to contradict or repudiate such statement, admission, act, or failure to act.

*Travelers Ins. Co. v. Kearl*, 896 P.2d 644, 647 (Utah Ct. App. 1995) (quotation simplified). The McMurdies have presented sufficient evidence to demonstrate material issues of fact concerning each of these elements. Viewing the evidence in the light most favorable to the McMurdies, a reasonable fact-finder could conclude that Zane acted inconsistently with a later assertion of a statute of limitations defense and that the McMurdies reasonably relied on those actions to their detriment.

¶34   First, based on Harry's testimony, Zane's testimony, and the documents in this case, a jury could reasonably conclude that Zane made "a statement, admission, act, or failure to act" that was "inconsistent with a claim later asserted." *Id.* (quotation simplified). Specifically, the evidence could support a finding that Jeppesen's assertion of the statute of limitations is inconsistent with Zane's assurances to Harry that his investment remained secured by the trust deed and that the subsequent instruments merely extended the maturity date of the 2001 Note.

¶35 Second, the McMurdies produced evidence of "reasonable action or inaction by [Harry], taken on the basis of [Zane's] statement, admission, act, or failure to act." *Id.* (quotation simplified). To that end, Harry testified that he was aware he was nearing the end of the six-year limitation period in 2011 and approached Zane about the debt before the statute of limitations had run. A jury could find that Harry had reasonably delayed in initiating a foreclosure sale at that time based on Zane's assurances. More importantly, a jury could find that it was reasonable for Harry to do so in light of the 2011

Modification Agreement, executed two days before the statute of limitations would have otherwise expired.

¶36    Third, a jury could reasonably conclude that the McMurdies would be injured by "allowing [Jeppesen] to contradict or repudiate such statement, admission, act, or failure to act." *Id.* (quotation simplified). If Jeppesen is allowed to assert the statute of limitations, the foreclosure sale will be invalid and the McMurdies will have no recourse to recoup their loss.[7] Because the McMurdies have produced evidence to support each element of equitable estoppel, genuine issues of material fact preclude the entry of summary judgment.

¶37    The remaining question is whether Zane's conduct can estop Jeppesen from asserting the statute of limitations as a defense.[8] Under the equitable estoppel doctrine, "[i]f the actions of a defendant, its agents, or its privies induced delay in commencing an action, the court will not allow any of them to assert such delay as a defense." *Dansie v. Anderson Lumber Co.*, 878 P.2d 1155, 1160 (Utah Ct. App. 1994); *see also* 51 Am. Jur. 2d *Limitation of Actions* § 367 ("The doctrine of equitable estoppel

---

7. Zane's underlying debt to the McMurdies was discharged in bankruptcy. As a result, the McMurdies' only recourse was foreclosure on the Alpine Property. *See Johnson v. Home State Bank*, 501 U.S. 78, 82–83 (1991) (explaining that a bankruptcy discharge does not affect a secured creditor's right to foreclose on a lien, but does extinguish the right to sue the debtor personally for any deficiency).

8. Jeppesen claims that the McMurdies did not preserve the argument that Zane's conduct can be imputed to Jeppesen. We disagree. In the district court, the McMurdies moved the court to treat Jeppesen as Zane's agent, citing the same evidence upon which they rely on appeal.

may deprive a defendant of the defense of the statute of limitations if the plaintiff is induced to delay timely action by the promises of the defendant or the defendant's agent to settle, pay, perform or otherwise carry out the obligation or duty in question.").

¶38 In this context, privity means more than "a mutual or successive relationship to the same right or property." *Glen Allen Mining Co. v. Park Galena Mining Co.*, 296 P. 231, 233 (Utah 1931), *rejected on other grounds by Rawcliffe v. Anciaux*, 2017 UT 72, ¶ 16, 416 P.3d 362. For example, we have held that equitable estoppel may not be asserted against an innocent successor in title, where there is no allegation that the successor was involved in the fraudulent conduct or wrongdoing. *See Christensen v. American Heritage Title Agency, Inc.*, 2016 UT App 36, ¶ 30, 368 P.3d 125. Instead, to assert equitable estoppel, the McMurdies must point to facts other than mere succession of title "sufficient to show a connection between [Jeppesen] and the dilatory tactics of [Zane]." *See Dansie*, 878 P.2d at 1160.

¶39 Here, the McMurdies have produced sufficient evidence from which a reasonable jury could conclude that Zane and Jeppesen "maintained [the] type of relationship or engaged in [a] course of conduct such that it would be proper to impute" Zane's actions to Jeppesen. *Id.* In his deposition, Jeppesen testified that he knew criminal charges and administrative proceedings had been brought against his father, Zane for obtaining "a lot of money" by selling promissory notes to investors on behalf of the Beverly Hills project. He also understood that the McMurdies had given his father $500,000 in exchange for a promissory note secured by the Alpine Property.

¶40 While Jeppesen was serving an ecclesiastical mission in 2010, Zane asked him if it was okay to put the Alpine Property in his name. Zane transferred the property to his son via a quitclaim deed for no consideration. Jeppesen has never seen the

Alpine Property, does not know where it is located, and knows nothing about it other than "[i]t's 5 acres up on a hill." When asked why he was suing the McMurdies, Jeppesen responded, "For my dad's sake. He claims it's his property. . . ." He testified that it was Zane who asked him to file the lawsuit, and that he was not personally involved in making the arrangements.

¶41    When viewed in the light most favorable to the McMurdies as the nonmoving parties, this evidence was sufficient to create a genuine issue of material fact as to whether Zane's delaying tactics should be imputed to Jeppesen. The disputed issues of fact on the question of equitable estoppel precluded the entry of summary judgment.

CONCLUSION

¶42    Because there were genuine issues of material fact as to whether (1) the 2001 Note was extended or superseded, and (2) Jeppesen was estopped from asserting the statute of limitations, the district court erred in granting summary judgment. We therefore reverse the district court's summary judgment order and remand the case to the district court for further proceedings consistent with this opinion.

—————