2022 UT App 91

# THE UTAH COURT OF APPEALS

DIVERSIFIED STRIPING SYSTEMS INC., KMB EQUIPMENT LLC, KEVIN BECK, AND PAMELA K. BECK,
Appellants and Cross-appellees,

*v.*

JOE KRAUS, FLJ LLC, AND NATIONAL STRIPING INC.,
Appellees and Cross-appellants.

Opinion
No. 20200309-CA
Filed July 21, 2022

Third District Court, Salt Lake Department
The Honorable Todd M. Shaughnessy
No. 120901549

Jonathan O. Hafen, Rita M. Cornish, David P. Mooers-Putzer, and Timothy M. Willardson, Attorneys for Appellants and Cross-appellees

Jeremiah R. Taylor, D. Scott Crook, Taylor Cutler, and Christopher S. Feuz, Attorneys for Appellees and Cross-appellants

JUDGE JILL M. POHLMAN authored this Opinion, in which JUDGE RYAN D. TENNEY and JUSTICE DIANA HAGEN concurred.[1]

POHLMAN, Judge:

¶1    This case arises from a complex business dispute that culminated in a bench trial, after which the district court found one side liable for breach of contract and breach of fiduciary duty.

---

1. Justice Diana Hagen began her work on this case as a member of the Utah Court of Appeals. She became a member of the Utah Supreme Court thereafter and completed her work on the case sitting by special assignment as authorized by law. *See generally* Utah R. Jud. Admin. 3-108(4).

Both sides now appeal. The court's determinations on liability are not contested on appeal. Instead, the main issues before us focus on the court's decisions regarding lost profits and damages, joint and several liability, the availability of prejudgment interest, the applicable postjudgment interest rate, punitive damages, and postjudgment attorney fees. We affirm in part, reverse and vacate in part, and remand.

## BACKGROUND[2]

¶2      This dispute involves two groups in the pavement striping business. We first introduce the two groups and their joint venture, the four relevant documents, and the breakdown of the business relationship, followed by a description of the litigation and the resulting judgment and damages award.

### *The Beck Parties*

¶3      Kevin and Pamela Beck own or control several entities. One of those entities, Diversified Striping Systems Inc. (DSS), is the successor to National Striping Company, Incorporated (NSCI), which was a joint venture, the formation of which we describe below.[3] The Becks also own or control KMB Equipment LLC (KMB), which was formed to own construction equipment, which it would then lease to the Becks' other companies.

---

2. "On appeal from a bench trial, we view the evidence in a light most favorable to the trial court's findings, and therefore recite the facts consistent with that standard." *Grimm v. DxNA LLC*, 2018 UT App 115, ¶ 2 n.1, 427 P.3d 571 (cleaned up).

3. Because DSS is NSCI's successor, we refer to the joint venture as DSS throughout this opinion.

*The Kraus Parties*

¶4    Joe Kraus owned or controlled National Striping Inc. (NSI), which provided striping services in California. He also partially owned or controlled FLJ LLC (FLJ), a company that provided pavement striping services for highways and airports. Kraus was the only member of FLJ with operational experience; the other two members provided only capital. But in late 2009 or early 2010, FLJ's two capital investors left the company for reasons unrelated to this case, leaving Kraus with insufficient capital to achieve his business plans. Kraus needed to either scale back the operations of FLJ and NSI or secure an infusion of capital.

*The Joint Venture*

¶5    In mid-2010, Kraus and Kevin Beck began discussing the possibility of a joint venture. Kraus sought the Becks' investment in his striping business, and while the Becks had no experience in that industry, they had substantial experience in construction and contracting generally. Eventually, the Becks and Kraus agreed that they would form a company together, with the Becks owning 80% and Kraus owning 20%. The general nature of the agreement was that Kraus would contribute equipment and other assets owned by FLJ or NSI, and the Becks would contribute capital.

¶6    In 2011, Kraus and the Becks formed DSS to provide highway and airport striping services. DSS would use the employees, location, customer lists, contact information, and web domain of Kraus's existing striping business. It would also employ the general manager (Manager) of Kraus's existing business and use the striping trucks and other equipment owned by FLJ. Kraus would bring his experience, knowledge, and relationships for the benefit of DSS. He would be involved in the marketing and business strategy as well as provide general oversight of the venture.

¶7 The parties agreed that Kraus would not be an employee of DSS, nor would he draw a salary. Instead, Kraus's return on his investment would be in the form of 20% ownership in DSS and its expected profits. In addition, Kraus would be an executive officer or director of the company. To provide Kraus some income while the venture got off the ground, the parties agreed that Kraus would be given an advance on his anticipated 20% of DSS's profits. The advance would be equal to $70,000 per year for two years.

¶8 The Becks agreed to provide the capital necessary to achieve Kraus's business plan, including financing the purchase of an epoxy truck. An epoxy truck is a striping truck needed for certain jobs, such as the lucrative projects associated with striping airport runways and taxiways. Given that the Becks were running other businesses, they did not envision being heavily involved in DSS's management.

¶9 Kraus's preexisting business, NSI, had outstanding debts to vendors and suppliers that arose in connection with its prior operations. Kraus was personally responsible for these debts, and he was concerned that vendors might be reluctant to do business with the new venture if they knew he was involved. For this reason, and to allow him more time to sort out his finances, Kraus agreed that he would receive his equity in DSS "a year or so" after the business was formed and was operational. But it was always understood that Kraus would be a 20% owner of DSS in return for his and his companies' contributions.

*The Documents Memorializing the Agreement*

¶10 The parties' agreement was memorialized in four documents: the asset purchase agreement, a promissory note, a stock sale agreement, and a profit advance agreement.

¶11 First, the asset purchase agreement (the Asset Purchase Agreement), dated January 19, 2011, was entered into by FLJ and

KMB. FLJ was controlled by Kraus, and it owned striping equipment and related assets. KMB was owned and controlled by the Becks and was formed at the time of the transaction for the purpose of leasing equipment to DSS and other businesses.

¶12 Pursuant to the Asset Purchase Agreement, KMB agreed to pay FLJ $100,000 in exchange for the used equipment under the terms of the promissory note. The agreement states that the $100,000 is "payable without interest, when [KMB's] lease income from the subject equipment equals $100,000."[4] The equipment was not appraised or valued for purposes of the transaction. And although Kraus later testified that he had paid over $500,000 for the equipment, the district court did not determine its fair market value. Rather, the court found only that the fair market value at the time of the transaction exceeded the $100,000 figure recited in the Asset Purchase Agreement.

¶13 Second, the promissory note (the Note), dated February 25, 2011, reiterated the above payment terms. It stated that KMB would pay FLJ $100,000 "without interest, when [KMB's] lease revenue from the equipment purchased for which this note is given equals $100,000." The district court later found that KMB never paid FLJ the full $100,000 but that it made partial payments on the Note totaling $85,996.78, leaving an unpaid amount of $14,003.22.

¶14 Third, the stock sale agreement (the Stock Sale Agreement), dated February 18, 2011, was between DSS and Kraus. Under that agreement, DSS agreed to transfer to Kraus 200 shares of DSS stock, equal to 20% of the issued and outstanding shares, in return for a payment of $100,000, due on or before December 1, 2012. The Stock Sale Agreement also recited that Kraus was to be made a director or executive officer of DSS prior to the sale. The district

---

4. The parties do not appear to dispute that the lease revenue reached the $100,000 threshold at some point.

court later found that Kraus was never issued his 20% of the DSS shares. The parties disputed whether Kraus satisfied the conditions precedent to DSS's obligation to issue the shares to him. Yet the parties ultimately stipulated that at all relevant times Kraus had a 20% ownership interest in DSS and at all times was entitled to a 20% share of its profits.

¶15 Fourth, Kraus and DSS signed the agreement for advances against profits (the Profit Advance Agreement) in April 2011. Under this agreement, DSS agreed to pay Kraus $70,000 per year, or $5,833.33 per month, for the period from January 2011 through December 2012, totaling twenty-four months. Further, Kraus agreed that if his 20% share of DSS's profits fell below this amount, he would repay DSS for any overage. The district court later found that although DSS made some of these monthly payments until June 2011, DSS made no further payments after that month. The court found that the total unpaid amount under the Profit Advance Agreement was $108,833.31.

*The Breakdown of the Joint Venture*

¶16 After the formation of DSS, Kraus transferred all the employees of his prior business to DSS. The Becks, however, arranged for the employees to be employed not by DSS, but by a payroll and human resources company owned by them, Professional Consulting Services (PCS). The Becks did not disclose this to Kraus until after the fact. Although Kraus was "not too concerned" about this alternate arrangement, it mattered to him how much PCS was going to charge DSS for the employees, and the Becks alone determined the amount and did not disclose it to Kraus in advance.

¶17 Shortly after DSS's formation, Manager began working as its general manager. DSS also began operating out of the location used by Kraus's previous business. Kraus provided DSS with all his customer and contact lists. And in March and April 2011,

Kraus caused all the striping equipment used by his prior business to be transferred to KMB.

¶18    For DSS to rent this equipment from KMB, Pamela Beck had told Kraus that KMB would charge 1–2% above the cost of maintaining the equipment. DSS exclusively used the equipment; it was not used by the Becks' other businesses or regularly rented to others. After the above transactions closed, KMB charged DSS $10,000 per month for renting this equipment. The district court found this "amount bore no relationship to the cost of maintaining the equipment" and, contrary to Pamela Beck's assurance, "was vastly greater than 1–2% above the cost of maintaining it." And, as it turned out, KMB also did not cover all the costs of repairing and maintaining the equipment; instead, KMB billed DSS for at least some repairs. Moreover, the Becks and their advisors determined the $10,000 amount without consulting Kraus. He found out about it after the fact and did not agree with the charge.

¶19    The Becks arranged for KMB to buy the epoxy truck for $510,000. KMB financed the purchase and paid $9,504.61 per month on the loan. KMB then charged DSS a $20,000 monthly rental fee for the epoxy truck. As with the $10,000 monthly charge for the other equipment, KMB, the Becks, or the Becks' advisors determined the rental fee for the epoxy truck without consulting Kraus in advance.

¶20    Under the foregoing arrangement, DSS did not own any of the equipment necessary to carry out its striping business. Instead, it would be obligated to pay KMB—an entity controlled and wholly owned by the Becks—at least $30,000 per month to rent the necessary equipment.

¶21    As DSS was launching, Kraus continued to pay various bills related to the business, including payroll and utilities. Kraus also paid DSS the proceeds from work that was already in progress. In total, Kraus contributed $122,614.61 in value to DSS.

But DSS did not reimburse him in full for these contributions. It paid him only $85,996.78, leaving a balance owing of $36,617.85.[5]

¶22     DSS bid for and obtained jobs, including in California, using NSI's contractor's license. According to Kraus, he never authorized DSS to use NSI's contractor's license.

¶23     Through the summer and fall of 2011, the Becks involved Kraus less and less in the joint venture. Kraus also faced increasing difficulty in getting reimbursed for expenses that he paid for DSS to operate.

¶24     Finally, in November 2011, the Becks caused DSS to move out of the facility owned by Kraus. They also instructed Manager and other employees not to give Kraus a key to the facility or allow him on the premises. Afterward, communication with Kraus was limited.

¶25     Meanwhile, PCS was charging markups and overhead costs associated with the employees working for DSS. These markup and overhead charges were designed to reflect services being provided by the "home office" in Salt Lake City. The district court found that DSS was, in effect, paying the salary and benefits of the Becks and upper management through these charges. Despite receiving their compensation indirectly through these overhead charges, the Becks also directly paid themselves at least $78,000 each from DSS in 2011. This sum was not a distribution of profits.

¶26     In late 2011 and early 2012, as the business relationship continued to sour, Kraus began contacting various contractors with whom DSS was doing business and from whom payments for contracts were owing. Kraus told them that DSS did not have

---

5. Although the district court's calculation of the balance appears to be two cents too high, we refer to $36,617.85 throughout this opinion because that is the amount stated in the judgment.

a valid contractor's license and was operating under NSI's license. Kraus further directed these contractors to make payments to NSI, not DSS. He claimed that he did this because he had not given permission for DSS to use NSI's license and because he wanted to pressure DSS and the Becks to deal fairly with him.

¶27  Soon after, the Becks' representatives reached out to Kraus to try to finalize the remaining terms of the business relationship and inquire about payments owed to him. But Kraus refused to discuss the matter and did not return phone calls. Next, Kraus contacted and advised internet service providers that DSS was unlawfully using domain names because Kraus was still the registered owner of the websites. As a result, email communications with customers and vendors ceased. Kraus's conversations with contractors also led to at least one contractor directly paying NSI.

¶28  The Becks responded by changing the name of the joint venture to DSS and by excluding Kraus from its operation. DSS continued to operate until April 2016, when the Becks shut it down. As part of its liquidation, the Becks caused KMB and DSS to sell the equipment, including the epoxy truck, to a competitor for $960,486.51.

*The Litigation*

¶29  In 2012, the Becks, DSS, and KMB (collectively, the Beck Parties) filed suit against Kraus, FLJ, and NSI (collectively, the Kraus Parties).[6] The Beck Parties asserted causes of action for fraud, tortious interference with existing or prospective economic

---

6. The Becks and KMB were not initially named as parties; they were added as plaintiffs when a third amended complaint was filed in 2015.

advantage, and defamation. The Kraus Parties, in turn, raised counterclaims for breach of contract and breach of fiduciary duty.[7]

¶30    The matter was tried to the bench in 2019. At the conclusion of trial, the district court issued written findings of fact and conclusions of law, addressing each of the parties' claims.

¶31    The district court first determined that the Beck Parties' claims lacked merit. It therefore dismissed their claims with prejudice.

¶32    Next, the district court addressed the Kraus Parties' counterclaims. With respect to the breach of contract claim, the court first found that the Kraus Parties had performed all their material obligations under the Asset Purchase Agreement (between KMB and FLJ), the Stock Sale Agreement (between DSS and Kraus), and the Profit Advance Agreement (between DSS and Kraus), or, in the alternative, that the Kraus Parties' performance was excused by the Beck Parties' prior material breach. The court then found that KMB breached the Asset Purchase Agreement and the Note by failing to pay FLJ the amounts due thereunder; DSS had breached the Profit Advance Agreement by failing to pay Kraus the amounts due thereunder; and DSS also had breached the Stock Sale Agreement by failing to issue 20% of the shares to Kraus and to appoint him as an officer or director. Additionally, the court found that DSS breached its obligation to reimburse Kraus for amounts due to him. The court found that the Kraus Parties were harmed as a direct and proximate result of these breaches.

---

7. The Kraus Parties also raised counterclaims for breach of the implied covenant of good faith and fair dealing, promissory estoppel, fraudulent transfer, alter ego, conversion, fraud, and unjust enrichment. But those claims are not relevant to this appeal.

¶33    As for Kraus's claim for breach of fiduciary duty, the court found that the Becks caused the companies under their control to breach duties owed to Kraus. The court explained that, as majority shareholders in DSS, the Becks had a fiduciary duty to deal fairly and openly with Kraus, who was a minority shareholder in DSS. The Becks then caused KMB and PCS, companies in which they were the sole shareholders, to do business with DSS. The court found that the "terms of those business arrangements stood to benefit, directly and indirectly, the Becks and to damage or injure the interests of [DSS]." It further found that the Becks "had an economic interest in minimizing the profits of [DSS], to which they would only be entitled to 80%, and maximizing the profits of KMB and PCS, to which they would be entitled to 100%." Because these transactions "were plainly self-interested," the Becks "had a duty to ensure the fairness of the transaction to [DSS], along with a duty to disclose to Kraus, as a minority shareholder, the terms of those agreements." The court found that although Kraus was advised that DSS would be doing business with KMB and PCS, "the Becks failed to disclose the terms of those arrangements and, in particular, the fact that [DSS] would be obligated to pay KMB and PCS substantial sums each month." Those amounts "would come directly out of the potential profits of [DSS]"—profits in which Kraus had a 20% interest.

¶34    In addition, the court found that the Becks breached their fiduciary duties by causing DSS to pay them "salaries" of at least $78,000 each in 2011. It also found that the Becks failed to show that the $10,000 monthly rental fee for equipment paid to KMB was "fair or commercially reasonable." The court found this fee was "merely . . . a way to syphon [DSS]'s revenues to KMB." Similarly, the court found that the $20,000 monthly amount that DSS paid to KMB for the epoxy truck was not fair or reasonable. It further found that the Becks violated their fiduciary duties by not disclosing to Kraus the terms of PCS's contracts with DSS and by failing to "provide Kraus any information about the company, its operations, or its profits despite him being a 20% equity

owner." The court thus concluded that clear and convincing evidence showed the Becks owed Kraus fiduciary duties, they breached those duties, and the breaches were the direct and proximate cause of harm to Kraus.

¶35    In summary, the district court determined that all the Beck Parties' claims failed on their merits, and it therefore dismissed those claims with prejudice. And the court determined that the Kraus Parties' claims for breach of contract and breach of fiduciary duty were meritorious.

¶36    On the question of damages, the district court determined that DSS owed Kraus $36,617.85 for unpaid reimbursements. It also considered whether to award lost profits to Kraus as a part owner in DSS. It acknowledged that new businesses, like DSS, "lack an actual record of past earnings," making "accurate predictions of . . . lost profits extremely difficult," but that perhaps other means existed to establish the requisite level of certainty to measure lost profits in this case. (Cleaned up.) At trial, Kraus presented an expert (Expert) to opine on the subject of lost profits. Expert opined that Kraus's share of the profits in this case amounted to $681,000. But the court rejected Expert's testimony as unreliable because "a number of [his] assumptions are speculative" and several of the adjustments in his analysis "tended to overstate the profitability of the company."

¶37    Yet the court found that DSS was in fact profitable, and it "believe[d] that a reasonable, rational, lost profits calculation can be made from the assumptions and beliefs held by the parties at the time of contracting." Specifically, the court found that at DSS's inception, "all parties envisioned that the true profits of the venture would be at least $350,000 per year for the first two years of operation" and that "20% of that amount is $70,000, the amount the parties used in the [Profit Advance Agreement]." The court determined that this amount represented the parties' "best estimate" of DSS's "likely profits, at least for the first two years."

Given that DSS operated for five and one quarter years, the court decided that a "conservative calculation of Kraus's lost profits," based on the Profit Advance Agreement, for the five-year period was $367,500. It then subtracted the $31,166.69 that DSS had actually paid Kraus under the Profit Advance Agreement, thus reducing his lost profits to $336,333.31. From this amount, the court also subtracted the $108,833.31, which was the unpaid amount under the Profit Advance Agreement and was awarded separately. That left Kraus's lost profits at $227,500.

¶38    The district court then accounted for the amounts realized upon DSS's liquidation. The court found that the equipment sold for $960,486.51, including the epoxy truck that KMB purchased for approximately $500,000. Because DSS never owned the epoxy truck, the court gave KMB credit for its full value, which meant that the rest of the equipment sold for approximately $450,000. The court decided that Kraus was entitled to 20% of that amount, which equaled $90,000. Adding this $90,000 to the $227,500 calculated above totaled $317,500.

¶39    Regarding the breach of the Asset Purchase Agreement and the Note, the court entered judgment in favor of FLJ and against KMB in the principal amount of $14,003.22, plus postjudgment interest at the statutory rate. *See supra* ¶¶ 12–13. Regarding the breach of the Profit Advance Agreement, the court entered judgment in favor of Kraus and against DSS in the principal amount of $108,833.31, plus postjudgment interest at the statutory rate. *See supra* ¶ 15. And regarding Kraus's claim for unpaid reimbursements, the court entered judgment in favor of Kraus and against DSS in the amount of $36,617.85, plus postjudgment interest. *See supra* ¶ 21. Notably, the court determined that for the Becks' breaches of their fiduciary duties, they would be jointly and severally liable for the awarded amounts described in this paragraph. For Kraus's breach of fiduciary duty claim, the court also ordered judgment in favor of

Kraus and against the Becks, jointly and severally, in the principal amount of $303,496.78, plus postjudgment interest.[8]

¶40 Kraus requested punitive damages. But the district court did "not find, by clear and convincing evidence, that the Becks' conduct was so extreme and outrageous as to warrant the imposition of punitive damages." The court thus declined to award them.

¶41 Finally, the court determined that the Kraus Parties were entitled to recover their reasonable costs and attorney fees. It also ordered that all awarded amounts would bear postjudgment interest from the date of the original judgment at the statutory rate set forth in Utah Code section 15-4-1. Both sides appeal.

ISSUES AND STANDARDS OF REVIEW

¶42 On appeal, the Beck Parties raise two main issues. First, they challenge the district court's lost profits award. "Whether the district court applied the correct rule for measuring damages is a question of law that we review for correctness." *Mahana v. Onyx Acceptance Corp.*, 2004 UT 59, ¶ 25, 96 P.3d 893. "Whether the amount awarded by the district court was supported by the evidence is a determination of fact that may be reversed on appeal only if clearly erroneous." *Id.*

¶43 Second, the Beck Parties contend that the district court erred in concluding that the Becks were jointly and severally liable to FLJ and Kraus for KMB's breach of the Asset Purchase Agreement and the Note. This issue involves the interpretation and application of statutory law and caselaw, which we review for correctness. *See Biesele v. Mattena*, 2019 UT 30, ¶ 13, 449 P.3d 1 (reviewing a challenge to the imposition of joint and several

---

8. The $303,496.78 total results from subtracting the $14,003.22 (awarded separately) from the $317,500 above. *See supra* ¶ 38.

liability for correctness given that the argument raised "questions of the application and interpretation" of the Liability Reform Act); *Ortega v. Ridgewood Estates LLC*, 2016 UT App 131, ¶ 29, 379 P.3d 18 ("The district court's interpretation of case law presents a question of law, which we review for correctness.").

¶44      On cross-appeal, the Kraus Parties raise four main issues. First, they contend that the district court incorrectly denied them prejudgment interest. "A trial court's decision to grant or deny prejudgment interest presents a question of law which we review for correctness." *Cornia v. Wilcox*, 898 P.2d 1379, 1387 (Utah 1995).

¶45      Second, the Kraus Parties contend that the district court applied the incorrect postjudgment interest rate, claiming that the rate of 10% should have been applied to the damages awarded for breach of contract. "Whether the trial court applied the correct interest rate is a question of law, which we review for correctness." *Knight Adjustment Bureau v. Lewis*, 2010 UT App 40, ¶ 2, 228 P.3d 754.

¶46      Third, the Kraus Parties contend that the district court erred by applying the wrong legal standard for punitive damages. "Whether the trial court employed the proper standards presents a legal question which is reviewed for correctness." *Chandler v. Blue Cross Blue Shield of Utah*, 833 P.2d 356, 360 (Utah 1992).

¶47      Fourth, the Kraus Parties contend that the district court erred in denying them postjudgment attorney fees. This issue turns on the application of rule 73 of the Utah Rules of Civil Procedure. "[W]e review a district court's interpretation and application of our rules of civil procedure for correctness." *Sanders v. Sanders*, 2021 UT App 122, ¶ 4, 502 P.3d 1230.

ANALYSIS

I. The Beck Parties' Issues on Appeal

A.    Lost Profits

¶48    The Beck Parties contend that the "district court erred in finding, calculating, and awarding damages for breach of fiduciary duty against the Beck Parties"—a damages award that was largely based on Kraus's lost profits in the joint venture, DSS. The Beck Parties' challenge is threefold. First, they contend that the court "erred in awarding Kraus lost profits in an amount based on a determination that twenty percent of DSS's profits every year would be $70,000." Second, the Beck Parties contend that "it was error for the district court to include 20% of the amount KMB realized upon the sale of its assets in the damages award." Third, they contend that the flaws in the lost profits damages award are so intertwined with the damages awarded for breach of contract that this court should vacate the damages award in its entirety and remand for reconsideration. We address each argument in turn.

1.    Whether the Lost Profits Were Reasonably Certain

¶49    The Beck Parties challenge the district court's determination that Kraus suffered $70,000 annually in lost profits, arguing that its calculation "was based on legally irrelevant evidence, was speculative, and was clearly erroneous." The Beck Parties assert that the court "fashioned a lost profits analysis based solely on the parties' pre-venture [Profit] Advance Agreement" and that, by doing so, the court "incorrectly transformed Kraus's desired salary for DSS's first two years of operation into a full-blown lost profits analysis." According to the Beck Parties, the "figure the district court used for its lost profits finding—$70,000 per year—was never an actual estimate of Kraus's profits." Rather, it "was simply what Kraus thought he needed to live on while DSS got up and running, until Kraus

would receive a distribution of DSS's actual profits." They claim that the "extrapolat[ed]" figure is "speculative because neither Kraus nor the Becks made any calculation or relied on facts about the business in setting the $70,000 per year projection." If we agree, the Beck Parties request that we remand the case to the district court for reconsideration of any lost profits damages.

¶50 Kraus defends the district court's damages award, arguing that the lost profits were established with the requisite "reasonable certainty." In his view, the Profit Advance Agreement "alone establishe[d] the reasonability of the court's lost profit calculation" because the Becks themselves "agree[d] that a reasonable amount of advanced profits was $70,000 per year" and their willingness to advance that amount inherently reflected "their assumption that the company's actual profitability would reasonably relate to the amount advanced." Kraus also argues that the court properly took into consideration the totality of the circumstances, including that the Becks "did their own independent due diligence" on the equipment that Kraus contributed and the state of Kraus's business during negotiations; that the Becks had "substantial experience in the construction business"; that the Profit Advance Agreement was executed three months into DSS's operations such that the Becks "had already experienced first-hand the performance and potential of the joint venture"; that DSS was actually profitable; and that the Becks were able to syphon money away from DSS (including paying themselves $78,000 each in 2011). Kraus also asserts that the Beck Parties' arguments merely ask this court to "re-weigh the evidence."

¶51 The district court determined that it could make a reasonable calculation of Kraus's lost profits stemming from the Becks' breaches of fiduciary duties, even though DSS was a new business that lacked an actual record of past earnings. It reasoned that it could do so based on "the assumptions and beliefs held by the parties at the time of contracting." In particular, it found that

"all parties envisioned that the true profits of the venture would be at least $350,000 per year for the first two years of operation." Kraus's 20% share of that amount is $70,000, which is the same amount that the parties used in the Profit Advance Agreement that they executed in April 2011. The court thus saw $70,000 as the parties' own "best estimate at the time of the venture's likely profits, at least for the first two years of operation." It then multiplied that amount by the number of years that DSS operated, concluding that the total amount represented a "conservative calculation" of Kraus's lost profits given that DSS was a start-up and other circumstances. We ultimately cannot affirm the court's decision.

¶52    "It is well settled that, although the plaintiff has the burden of proving the fact, causation, and amount of damages, [the plaintiff] need only do so with reasonable certainty rather than with absolute precision." *Alta Health Strategies, Inc. v. CCI Mech. Service*, 930 P.2d 280, 286 (Utah Ct. App. 1996) (cleaned up). Further, "although damages may not be determined by speculation or guesswork, evidence allowing a just and reasonable estimate of the damages based on relevant data is sufficient." *Id.* (cleaned up).

¶53    Lost profits damages in particular "must be established with reasonable certainty." *Cook Assocs., Inc. v. Warnick*, 664 P.2d 1161, 1165 (Utah 1983). Put differently, lost profits must be proved with "sufficient certainty that reasonable minds might believe from a preponderance of the evidence that the damages were actually suffered." *Id.* (cleaned up); *accord Kilpatrick v. Wiley, Rein & Fielding*, 2001 UT 107, ¶ 76, 37 P.3d 1130.

¶54    Our supreme court has explained that "the pivotal question" surrounding lost profits "is not whether the plaintiff has proven an established earning record but whether [the plaintiff] has proven the damages for lost profits with reasonable certainty, although the former is often relevant to the latter." *Cook*,

664 P.2d at 1166 (cleaned up). An established business's "record of past earnings obviously increases the certainty with which one could predict future profits." *Id.* "But that fact should not automatically preclude new businesses from recovering lost profits because they lack such a record." *Id.* "Rather, new businesses should be allowed to try to prove lost profits up to a reasonable level of certainty by other means, just as established businesses are permitted to do." *Id.* And "[o]nce a defendant has been shown to have caused a loss, [the defendant] should not be allowed to escape liability because the amount of the loss cannot be proved with precision." *Id.*; *accord Kilpatrick*, 2001 UT 107, ¶ 76. "Consequently, the reasonable level of certainty required to establish the *amount* of a loss is generally lower than that required to establish the *fact* or *cause* of a loss." *Cook*, 664 P.2d at 1166.

¶55 A lost profits claim cannot "rest[] on an assumption unsupported by the record" or be based on evidence that is "wholly speculative." *First Sec. Bank of Utah, NA v. J.B.J. Feedyards, Inc.*, 653 P.2d 591, 596 (Utah 1982). Yet, "while the evidence must not be so indefinite as to allow the [factfinder] to speculate as to [lost profits], some degree of uncertainty is tolerable." *Carlson Distrib. Co. v. Salt Lake Brewing Co.*, 2004 UT App 227, ¶ 19, 95 P.3d 1171 (cleaned up). "It is, after all, the wrongdoer, rather than the injured party, who should bear the burden of some uncertainty in the amount of damages." *Atkin Wright & Miles v. Mountain States Tel. & Tel. Co.*, 709 P.2d 330, 336 (Utah 1985).

¶56 Importantly, the evidence of lost profits "must be evidence that rises above speculation and provides a reasonable, even though not necessarily precise, estimate of damages." *See id.* Utah law thus allows for the amount of damages to be "based upon approximations, if the fact of damage is established, and the approximations are based upon reasonable assumptions or projections." *Id.*; *see also Francis v. National DME*, 2015 UT App 119, ¶ 28, 350 P.3d 615.

¶57 Here, Kraus insists that the district court's consideration of "all of the relevant circumstances surrounding the parties' dealings" established the "reasonable certainty of [its] lost profit calculation." We do not share this view. Although the court broadly acknowledged "the totality of the circumstances, including the start up nature of the venture," it derived the $70,000 figure for Kraus's annual lost profits directly from the Profit Advance Agreement. The court's reference to DSS's "start up nature," in context, likely referred to how DSS did not have an actual record of past earnings and therefore any lost profits had to be established by other means. *See Cook*, 664 P.2d at 1166. And given that the court found that Expert—who testified on Kraus's behalf—offered "speculative" and unreliable opinions on lost profits, the court ultimately relied on the Profit Advance Agreement as an alternative means of providing the basis for a lost profits calculation. In other words, we agree with the Beck Parties that the district court's lost profits analysis was based solely on the Profit Advance Agreement.

¶58 The Beck Parties assert that even if the Profit Advance Agreement "was based on the parties' pre-venture estimate of profits," the court's reliance on it was still "inappropriate" because "[l]ost profits damages must be proven by expert testimony, as projecting potential profits requires technical or specialized knowledge." We do not embrace this view. When a business is new and a past earnings record is thus unavailable, "[a]lternative means of establishing the certainty of lost profits include expert testimony of profit potential, evidence of the actual profits of similar businesses, and evidence of subsequent earnings of the business claiming lost profits." *Cook*, 664 P.2d at 1166 n.4; *see also Kilpatrick*, 2001 UT 107, ¶¶ 76–77 ("One method of measuring damages in such a situation is by expert testimony."). Although expert testimony may be one available means of showing lost profits, our caselaw does not necessarily *require* expert testimony for lost profits to be used as a measure of

damages for a new business.[9] *See Cook*, 664 P.2d at 1166 & n.4. By the same token, we do not read our caselaw to mean that the three methods mentioned above are the only possible methods of establishing the reasonable certainty of lost profits. *See id.*

¶59    The court used the Profit Advance Agreement to find that "all parties envisioned that the true profits of the venture would be at least $350,000 per year for the first two years of operation." The court reasoned that because Kraus was entitled to 20% of DSS's profits and because his annual advance under the Profit Advance Agreement was $70,000, the $350,000 represented the parties' "best estimate" of DSS's likely profits (20% of $350,000 = $70,000). But Utah law requires that this approximation be "based upon reasonable assumptions or projections" or be a "reasonable, even though not necessarily precise, estimate of damages." *See Atkin*, 709 P.2d at 336.

¶60    We conclude that the district court's calculation of Kraus's annual lost profits of $70,000 was not based on "reasonable

---

9. Yet the Beck Parties suggest that *Ghidotti v. Waldron*, 2019 UT App 67, 442 P.3d 1237, directs that "[l]ost profits damages must be proven by expert testimony." In that case, the district court concluded that the new business owners there "could not prove their damages with the requisite degree of certainty because they did not have an expert to testify on profit potential." *Id.* ¶¶ 7, 20 (cleaned up). On appeal, the new business owners challenged the district court's decision that they had failed to properly disclose an expert witness, but they did not argue that they should have been able to prove their damages through other available means. *Id.* ¶¶ 9, 13 & n.5. Because they relied solely on expert testimony as the method by which they intended to prove lost profits damages, *see id.* ¶¶ 13–14 & n.5, and because this court affirmed that their disclosure was inadequate, *id.* ¶ 15, we are not persuaded that *Ghidotti* stands for the broader proposition for which the Beck Parties advocate.

assumptions or projections" of DSS's likely profits. *See id.* The court relied on the $70,000 figure included in the Profit Advance Agreement, but that amount was not based on the parties' pre-venture estimate of profits. The agreement itself says nothing to indicate that it was based on the parties' estimate or projection of DSS's profitability. It states only that Kraus was "entitled to receive an advance against profits totaling $70,000 per year" for two years and that Kraus would "be liable to repay [DSS] the shortfall if, at the end of two years, 20% of the actual profits earned by [DSS was] less than the total amount advanced" to Kraus under the Profit Advance Agreement.

¶61    Other evidence in the record similarly does not support a finding that the $70,000 figure was tethered to a projection of expected profits. Kraus himself testified that rather than becoming DSS's salaried employee, he opted to receive the advances under the Profit Advance Agreement so that he could "live," "get [his] bills paid," and "run [his] other companies." As Kraus explained, the $70,000 figure was merely "what [he] had asked for and [Kevin Beck] agreed." The fact that the parties ultimately labeled it a "profit advance" does not demonstrate that $70,000 reflected the parties' estimate of Kraus's share of DSS's likely profits, much less that it reflected a reasonable estimate. Rather, it was undisputed that the number was based entirely on what Kraus needed to live and pay his bills, the number was not "negotiable," and he was to receive the amount during the first two years "regardless of whether [the joint venture] was profitable." Kraus has pointed to no evidence to suggest that either side conducted a profitability analysis or that the $70,000 figure was consistent with their expectations for the joint venture.[10]

---

10. Kraus invites this court to speculate that the Becks agreed that the $70,000 figure "was a reasonable approximation of . . . Kraus's

(continued…)

¶62    As a result, the district court's lost profits analysis "rests on . . . assumption[s] unsupported by the record." *See First Sec. Bank*, 653 P.2d at 596. We thus conclude that Kraus's lost profits damages were not established with reasonable certainty, and we therefore reverse and vacate this portion of the district court's award. Having agreed with the Beck Parties that the court's decision on lost profits was infirm, we remand for the court to reconsider whether any other evidence would support a reasonably certain basis for lost profits damages.[11]

2.    Whether Kraus Should Have Received 20% of the Value of KMB's Liquidated Assets

¶63    The Beck Parties also complain that the "district court's damages award for lost profits impermissibly included $90,000

---

share of profits" based on their "own expectations" and "assumptions of profitability." But Kraus has not shown what the Becks' expectations were or that in agreeing to the non-negotiable $70,000 advance, they engaged in any kind of profitability analysis. Further, Kraus has not shown that, even if the Becks had assumptions or projections about the venture's profitability, those assumptions or projections were reasonable. *See Atkin Wright & Miles v. Mountain States Tel. & Tel. Co.*, 709 P.2d 330, 336 (Utah 1985) ("The amount of damages may be based upon approximations . . . [if] the approximations are based upon reasonable assumptions or projections."); *Webb v. Utah Tour Brokers Ass'n*, 568 F.2d 670, 677 (10th Cir. 1977) (applying Utah law and concluding that evidence failed to show "a tangible foundation" from which a factfinder could determine that a reasonable probability existed that profits would have been made).

11. The parties have not identified another basis for the lost profits award, and we express no opinion on whether any such basis exists in the evidence.

that represented 20% of the amounts realized by KMB on the liquidation of its assets." They make two points on this score. First, they assert that Kraus was not entitled to this amount because he did not own any interest in KMB. Second, they assert that the $90,000 impermissibly gave Kraus a double recovery because it was "duplicative of the lost profits awarded to Kraus and the contract damages awarded to FLJ, Kraus's entity."

¶64 On their second point, the Beck Parties argue that the $90,000 was duplicative of the lost profits award because the "injury to DSS (and, therefore, Kraus) flowing from" the Becks' breach of fiduciary duty—which was causing DSS to enter into self-interested transactions with KMB related to renting the equipment—"is measured by the amount KMB overcharged DSS" and was already "captured in the lost profits measure of damages." And a portion of the $90,000, they assert, is duplicative of the $14,003.22 awarded to FLJ for KMB's breach of the Asset Purchase Agreement and the Note because the $14,003.22 represented the shortfall on the $100,000 sale price and "fully compensated FLJ (and through it, Kraus) for the value of the equipment sold to KMB." In other words, "[i]t is as though he/FLJ both sold the equipment to KMB for $100,000 but continued to own it until KMB liquidated it."

¶65 Kraus responds that DSS and KMB, together, operated the striping business and that "[w]hile Mr. Kraus may not have owned any interest in KMB," he placed the equipment with KMB and "he certainly was a partner in the joint venture" with the Becks. Kraus argues that if the Becks had not "forced [him] out" of DSS, he would have received 20% of the profits while DSS operated and would have received his fair share of the proceeds from the liquidation of the joint venture. He also argues that the Becks' actions "with regard to KMB that undermined the joint venture would certainly justify an award of damages." Kraus further argues that no double recovery occurred here because the

parties' transactions and agreements were "interrelated" and "cannot be separated."

¶66 The district court found that the Becks sold "the equipment" related to DSS's striping business, including the epoxy truck, for $960,486.51. Under DSS and KMB's business arrangement, DSS never owned any of the striping equipment. Rather, KMB owned the equipment and leased it to DSS. Because KMB originally purchased the epoxy truck and DSS did not own it, the court gave KMB credit for its full value. The court then found that the rest of the equipment sold for approximately $450,000, and it awarded Kraus 20% of that amount, which equaled $90,000.

¶67 Both sides agree that "the equipment" referred to in the court's findings included other assets in addition to the striping equipment owned by KMB.[12] But the court did not draw a distinction between the striping equipment and any other assets included in the liquidation.

¶68 This distinction matters because we agree with the Beck Parties that Kraus was not an owner of KMB and therefore was not entitled to a share of the sale proceeds of KMB's equipment. *Cf.* Utah Code Ann. § 48-3a-711(2)(b) (LexisNexis 2015) (providing that after discharging its obligations when winding up, a limited liability company will distribute any remaining surplus "in equal

---

12. In support, Kraus relies on a trial exhibit of an asset purchase agreement related to the liquidation and attached it as an addendum to his brief. But the trial exhibits were not included in the record on appeal, and "this court's power of review is strictly limited to the record presented on appeal." *See Reperex, Inc. v. May's Custom Tile, Inc.*, 2012 UT App 287, ¶ 12, 292 P.3d 694 (cleaned up). In any event, we need not consider this exhibit in light of the Beck Parties' acknowledgment that other assets were part of the liquidation.

shares among members and dissociated members"). Yet when the court awarded Kraus $90,000, Kraus received a portion of the proceeds related to assets that had belonged to KMB. Although Kraus believes that his ownership in the joint venture entitled him to recover this portion of the sale because "placing the equipment in KMB was part of that joint venture," he provides no authority for the notion that his participation in the joint venture entitled him to recover under the circumstances here, particularly where he freely transferred ownership of the equipment so that he could acquire a 20% stake in DSS. We thus conclude that Kraus should not have received a portion of the sale of KMB's equipment, and we vacate this portion of his award.

¶69 Nevertheless, Kraus was a co-owner of DSS and therefore is entitled to 20% of the sale proceeds that related to any assets that had belonged to DSS. On remand, the district court should reassess the proceeds from the liquidation and exclude the amounts related to the sale of KMB's equipment from Kraus's award. It should also make specific findings regarding the amount of proceeds related to assets owned by DSS, and then the court may award Kraus a portion of those proceeds. *See generally Bastian v. King*, 661 P.2d 953, 957 (Utah 1983) (instructing district courts to provide factual findings that demonstrate that "there is a rational basis for the award of damages" and that "the findings support the judgment and that the evidence supports the findings"). Although we do not opine on the Beck Parties' double recovery arguments, the district court should, if presented, consider any such arguments made on remand.

3.      Whether the Entire Damages Award Should Be Vacated

¶70 Third, the Beck Parties contend that the entire damages award should be vacated because the flaws identified above are "intertwined with" the remainder of the award. Again pointing to the district court's reliance on the Profit Advance Agreement to

project DSS's profits as $350,000 per year, the Beck Parties contend that the court's calculation of damages for the breach of the Profit Advance Agreement—$108,833.31—was likewise "impermissibly speculative." This is true, the Beck Parties argue, because the terms of that agreement would have required Kraus to repay DSS if Kraus's share of the actual annual profits fell below $70,000. The Beck Parties thus urge this court to vacate the award and remand for additional findings or a new hearing.

¶71   We agree that the district court needs to reassess the entire damages award, especially given that we have vacated other portions of the award. We also agree with the Beck Parties that the court should reevaluate the $108,833.31 related to the breach of the Profit Advance Agreement. Although that amount reflects the shortfall from the $140,000 that Kraus expected to receive under that agreement, the agreement's repayment provision meant that Kraus would not necessarily keep that entire amount "if, at the end of two years, 20% of the actual profits earned by [DSS was] less than the total amount advanced." The court found that DSS was profitable at some point, but the court did not make specific findings about what, if any, profits DSS realized or when. Further, it is unknown whether any such profits were sufficient for Kraus to have avoided liability for repayment. In other words, the $108,833.31 appears to presume that the $350,000 figure derived from the Profit Advance Agreement accurately reflected DSS's profits and that Kraus would have no repayment obligation. But we have rejected the court's reliance on the Profit Advance Agreement as a basis for determining lost profits, and that decision leaves the court's award for breach of that agreement without a foundation. Accordingly, the court on remand should reassess the amounts to which Kraus is entitled under the Profit Advance Agreement, if any, and provide appropriately detailed findings.

B.     Joint and Several Liability

¶72     As their last issue on appeal, the Becks contend that the district court erred in imposing joint and several liability on them for the $14,003.22 related to KMB's breach of the Asset Purchase Agreement and the Note. According to the Becks, they cannot be held personally liable for KMB's liabilities under corporate law.

¶73     The district court determined that KMB breached the Asset Purchase Agreement and the Note by failing to pay the amounts due thereunder in exchange for FLJ's used equipment. Specifically, KMB fell short $14,003.22 of the amount due to FLJ. The court also determined that "the Becks breached fiduciary duties owed by them to Kraus, and caused the companies under their control to breach duties owed to Kraus, which itself amount to a breach of these contractual obligations." And the court ultimately held the Becks jointly and severally liable for the $14,003.22 owed by KMB to FLJ.

¶74     Generally, a "member or manager [of a limited liability company] is not personally liable, directly or indirectly, by way of contribution or otherwise, for a debt, obligation, or other liability of the limited liability company solely by reason of being or acting as a member or manager." Utah Code Ann. § 48-3a-304(1) (LexisNexis 2015). But a member or manager "may be held 'personally liable for his limited liability company's contractual breaches if he assumed personal liability, acted in bad faith or committed a tort in connection with the performance of the contract.'" *H&P Invs. v. iLux Cap. Mgmt. LLC*, 2021 UT App 113, ¶ 50, 500 P.3d 906 (quoting *Reedeker v. Salisbury*, 952 P.2d 577, 582 (Utah Ct. App. 1998)). When the district court imposed joint and several liability for the $14,003.22 on the Becks—members of KMB—the court effectively imposed personal liability on them.

¶75     The court appears to have premised its decision on its conclusion that the Becks breached their fiduciary duties to Kraus in connection with KMB's performance of the Asset Purchase

Agreement and the Note. *See id.* And the Becks have not carried their burden of persuasion to show error in the court's decision. *See generally 1600 Barberry Lane 8 LLC v. Cottonwood Residential O.P. LP*, 2021 UT 15, ¶ 53, 493 P.3d 580 (explaining that appellants shoulder "the burden of persuasion to convince the reviewing court that the district court erred"). The Becks assert that their fiduciary duties to Kraus with respect to their joint venture "cannot be read so broadly as to require the Becks to ensure that other entities they control (like KMB) never breach an agreement with an entity that Kraus controls (like FLJ)." But beyond that, they do not explain why. Instead, they cite, without analysis, a string of cases from various jurisdictions that stand generally for the proposition that fiduciary duties between partners do not extend to unrelated business ventures. *See, e.g.*, *LG & E Cap. Corp. v. Tenaska VI, LP*, 289 F.3d 1059, 1063–64 (8th Cir. 2002) (collecting cases indicating that a party's fiduciary duties to another party are limited to dealings involving their joint venture). But here, KMB's obligations and breach were tied to the joint venture, so it is not evident that the Becks' authority is on point. And because the Becks have not shown that their breach of fiduciary duties could not support personal liability here, *see H&P Invs.*, 2021 UT App 113, ¶ 50, we cannot say that the district court erred in imposing joint and several liability on the Becks for the $14,003.22 award.

## II. The Kraus Parties' Issues on Cross-Appeal

### A.    Prejudgment Interest

¶76    The Kraus Parties contend that the district court erred in declining to award them prejudgment interest. Specifically, they assert that prejudgment interest should have been awarded with respect to three amounts in the judgment: (i) $14,003.22 relating to the breach of the Asset Purchase Agreement, (ii) $108,833.31 relating to the breach of the Profit Advance Agreement, and (iii) $36,617.85 relating to the unpaid reimbursements. After we

set forth Utah law on prejudgment interest, we address each of these amounts in turn.

¶77 "The purpose of awarding prejudgment interest is to compensate a party for the depreciating value of the amount owed over time and, as a corollary, to deter parties from intentionally withholding an amount that is liquidated and owing." *Encon Utah, LLC v. Fluor Ames Kraemer, LLC*, 2009 UT 7, ¶ 67, 210 P.3d 263 (cleaned up). In Utah, prejudgment interest is recoverable "where the damage is complete, the amount of the loss is fixed as of a particular time, and the loss is measurable by facts and figures." *Id.* ¶ 51 (cleaned up). This standard "focuses on the measurability and calculability of the damages," *id.* ¶ 52, and it requires "the amount of the loss [to] be calculated with mathematical accuracy in accordance with well-established rules of damages," *USA Power, LLC v. PacifiCorp*, 2016 UT 20, ¶ 100, 372 P.3d 629 (cleaned up).

¶78 Yet even though "all claims can be reduced eventually to monetary value," not all claims are subject to prejudgment interest. *See Canyon Country Store v. Bracey*, 781 P.2d 414, 422 (Utah 1989). Utah courts will not award prejudgment interest in cases "where the trier of fact has to use its 'best judgment in assessing the amount to be allowed for past as well as for future injury.'" *KTM Health Care Inc. v. SG Nursing Home LLC*, 2018 UT App 152, ¶ 81, 436 P.3d 151 (quoting *USA Power*, 2016 UT 20, ¶ 100). For example, cases involving wrongful death or defamation have "losses that cannot be calculated with mathematical accuracy" because the damage amounts are "determined by the broad discretion of the trier of fact." *USA Power*, 2016 UT 20, ¶ 100 (cleaned up).

¶79 When prejudgment interest is available, the applicable rate is typically dictated by statute. *See Beckman v. Cybertary Franchising LLC*, 2018 UT App 47, ¶ 64, 424 P.3d 1016. As relevant here, Utah Code section 15-1-1(2) provides, "Unless parties to a

lawful contract specify a different rate of interest, the legal rate of interest for the loan or forbearance of any money, goods, or chose in action shall be 10% per annum." Utah Code Ann. § 15-1-1(2) (LexisNexis 2013). This statute was amended in 2019 to allow for a 10% interest rate for "a claim for breach of contract." *Id.* (Supp. 2021) ("Unless the parties to a lawful written, verbal, or implied contract expressly specify a different rate of interest, the legal rate of interest for the contract, including a contract for services, a loan or forbearance of any money, goods, or services, or a claim for breach of contract is 10% per annum."). When a contract does not fall within the scope of section 15-1-1, the applicable interest rate is provided in section 15-1-4: "the federal postjudgment interest rate as of January 1 of each year, plus 2%." *Id.* § 15-1-4(3)(a); *see also USA Power*, 2016 UT 20, ¶ 109. These same statutes apply to determining the rates for postjudgment interest. *See USA Power*, 2016 UT 20, ¶ 106 n.187; *see also* Utah Code Ann. §§ 15-1-1, 15-1-4 (LexisNexis Supp. 2021).

¶80    We now consider each portion of the judgment to which the Kraus Parties claim entitlement to prejudgment interest.

1.    $14,003.22 Related to the Asset Purchase Agreement

¶81    FLJ argues that because KMB did not pay $14,003.22 of the $100,000 due under the Asset Purchase Agreement, the $14,003.22 was measurable by facts and figures and that the district court therefore should have awarded prejudgment interest on this amount. Although it acknowledges that the Asset Purchase Agreement provides that the $100,000 would be "payable without interest, when [KMB's] lease income from the subject equipment equals $100,000," FLJ asserts that this zero-interest provision "applies only to the extent that KMB timely paid the amount due," and that the "repayment would be 'without interest' only until the time [KMB's] lease revenue from the equipment equaled $100,000" and therefore was not intended to extend indefinitely. Further, because the agreement "does not specify an interest rate

applicable in the event of KMB's breach," FLJ contends that the court should have awarded 10% prejudgment interest under Utah Code section 15-1-1(2).

¶82 The Beck Parties respond that the "without interest" provision in the Asset Purchase Agreement shows that the parties agreed that the obligation would bear no interest at all. They also assert that the agreement "does not distinguish between pre-default and default interest rates" and therefore the applicable interest rate for this claim is zero.

¶83 We agree with FLJ that the $14,003.22 shortfall under the Asset Purchase Agreement and the Note qualifies for prejudgment interest. It represents a loss that is complete, "fixed as of a particular time," and readily "measurable by facts and figures." *See Encon Utah*, 2009 UT 7, ¶ 51 (cleaned up).

¶84 The Asset Purchase Agreement and the Note provided that the $100,000 would be "payable without interest, when [KMB's] lease income from the subject equipment equals $100,000." Looking at this plain language, *see Brady v. Park*, 2019 UT 16, ¶ 53, 445 P.3d 395 (explaining that when interpreting a contract, "we first look at the plain language of the contract" (cleaned up)), we disagree with the Beck Parties' claim that this provision meant that interest would never accrue. Instead, we read this to mean that there is no interest until payment on the $100,000 note became due. Thus, interest would not accrue on the $100,000 until the time when KMB's income from renting the equipment equaled $100,000. After that point, if the Note remained unpaid, nothing in the Asset Purchase Agreement and the Note precludes interest from accruing.

¶85 We further agree with FLJ that the $14,003.22 qualifies for the 10% interest rate under Utah Code section 15-1-1(2). Based on the Beck Parties' concession that the Asset Purchase Agreement "does involve a loan," we conclude that the 10% interest rate applies. *See* Utah Code Ann. § 15-1-1(2) (LexisNexis 2013); *see also*

*USA Power*, 2016 UT 20, ¶ 109. Accordingly, the district court should award FLJ prejudgment interest at 10% per annum on the $14,003.22 award.

2.      $108,833.31 Related to the Profit Advance Agreement

¶86    Kraus argues that given that DSS paid only $31,166.69 of the $140,000 it owed under the Profit Advance Agreement, the $108,833.31 award was measurable by facts and figures. He asserts that prejudgment interest should apply to this amount at 10% per year under Utah Code section 15-1-1.

¶87    The Beck Parties counter that the $70,000 per year "was not the actual amount owed Kraus under the agreement" because Kraus would have to repay some of this amount if DSS's profits were "less than $350,000 per year." They assert that because of the repayment provision, Kraus's recovery under the Profit Advance Agreement "could not be calculated with mathematical certainty" and therefore Kraus's award was not subject to prejudgment interest. Kraus responds that his "requirement to reconcile" the advance with the actual profits was "excused by [DSS's] failure to perform" its payment obligations under the Profit Advance Agreement. Moreover, he asserts that he "likely would not have had to repay any advanced profits."

¶88    As discussed above, we conclude that the district court, on remand, needs to reevaluate the $108,833.31 damages award related to the breach of the Profit Advance Agreement. *Supra* ¶ 71. Given that Kraus's entitlement to $140,000 under that agreement was contingent on DSS's actual profits, this aspect of Kraus's damages is too uncertain for us to assess whether prejudgment interest is available. If, on remand, the district court again determines that Kraus is entitled to damages for breach of the Profit Advance Agreement, the court should reassess the propriety of prejudgment interest under the standards we have discussed above. *Supra* ¶¶ 77–79.

### 3. $36,617.85 in Unpaid Reimbursements

¶89 Kraus contends that the $36,617.85 in unpaid reimbursements also met Utah's prejudgment interest standard. According to Kraus, DSS's failure to reimburse Kraus was a breach of an oral agreement, and because that agreement did not specify an interest rate, the applicable rate should be 10% under Utah Code section 15-1-1.[13] In contrast, the Beck Parties point to the lack of a specified interest rate and assert that it means "the amount of prejudgment interest is zero."

¶90 We agree with Kraus that the $36,617.85 in unpaid reimbursements satisfies the prejudgment interest standard. The court calculated this amount by taking the value of Kraus's reimbursable contributions ($122,614.61) and subtracting the amount he did receive ($85,996.78). *Supra* ¶ 21 & note 5. Thus, this damages award was "calculated with mathematical accuracy," *see USA Power*, 2016 UT 20, ¶ 100 (cleaned up), and prejudgment interest should accrue on the $36,617.85.

¶91 However, we disagree with Kraus that the applicable prejudgment interest rate is 10% under Utah Code section 15-1-1. To qualify for the 10% rate under that provision, Kraus must demonstrate that the agreement involved "the loan or forbearance of any money, goods, or chose in action." *See* Utah Code Ann. § 15-1-1(2); *see also USA Power*, 2016 UT 20, ¶ 109. Unfortunately for Kraus, he has not engaged in that analysis.

¶92 Instead, he argues for the application of an amended version of the statute, which allows for a 10% interest rate for "a claim for breach of contract." *See* Utah Code Ann. § 15-1-1(2) (LexisNexis Supp. 2021). But we "apply the law as it exists at the

---

13. Citing the court's findings, Kraus also claims the failure to reimburse was a breach of the Stock Sale Agreement. But it is unclear whether the court found that agreement to be a basis for this claim.

time of the event regulated by the law in question." *State v. Clark*, 2011 UT 23, ¶ 13, 251 P.3d 829. Because prejudgment interest is available only when "the amount of the loss is fixed as of a particular time," *Encon Utah*, 2009 UT 7, ¶ 51 (cleaned up), and all the Kraus Parties' losses were allegedly fixed before the current statute came into effect in 2019, we apply the earlier version of Utah Code section 15-1-1, *see Clark*, 2011 UT 23, ¶ 13; *cf. Gressman v. State*, 2013 UT 63, ¶ 14, 323 P.3d 998 (concluding that provisions affecting postjudgment interest, in a different context, affected substantive rights because they "enlarge, eliminate, or destroy vested or contractual rights and do not merely dictate the practice and procedure or the legal machinery by which the substantive law is determined or made effective" (cleaned up)). Accordingly, the Kraus Parties' claims to prejudgment interest cannot rely on the current statute's provision allowing for interest at 10% per annum for "a claim for breach of contract." *See* Utah Code Ann. § 15-1-1(2).[14]

---

14. Kraus suggests that we should give the current statute retroactive effect. But "[a] provision of the Utah Code is not retroactive, unless the provision is expressly declared to be retroactive." Utah Code Ann. § 68-3-3 (LexisNexis 2016); *see also Gressman v. State*, 2013 UT 63, ¶ 12, 323 P.3d 998. Kraus further argues that the current statute should be retroactive because the recent amendment merely "clarifies" the earlier enactment. Utah "case law has occasionally referred to amendments clarifying statutes as an exception to the retroactivity ban." *Gressman*, 2013 UT 63, ¶ 16 (cleaned up). To decide whether an amendment is a mere clarification, we ask "whether it alters or explains language already present in the original statute or whether the amendment added new language or subsections that did not exist in any form before the amendments were made." *Id.* ¶ 17 (cleaned up). "An amendment that does the former is more likely clarifying in nature; one that does the latter is not." *Id.* We conclude that the

(continued…)

¶93    Because Kraus has not established that section 15-1-1 provides the appropriate rate of interest, we conclude that Utah Code section 15-1-4 provides the applicable rate for prejudgment interest on his unpaid reimbursements.[15] *See USA Power*, 2016 UT 20, ¶ 109.

B.      Postjudgment Interest Rate

¶94    Next, the Kraus Parties challenge the district court's choice of postjudgment interest rate, arguing that the court erred in picking the rate under Utah Code section 15-1-4. They contend that under the current version of Utah Code section 15-1-1, "a post-judgment interest rate of 10% should be applied to the

---

current statute's amendment providing that the 10% annual interest rate applies to "a claim for breach of contract" added new language to the statute and was not merely clarifying. *See id.* *Compare* Utah Code Ann. § 15-1-1(2) (LexisNexis Supp. 2021), *with id.* (2013). For these reasons, we will not apply the current version of section 15-1-1 retroactively to this case.

15. Kraus also claims prejudgment interest with respect to the $90,000 that the district court awarded to him as his share of DSS's liquidation. We have vacated the $90,000 award and remanded for reconsideration. *Supra* ¶¶ 68–69. If, on remand, the district court determines that Kraus is entitled to a portion of the liquidation (while excluding proceeds from KMB's equipment), the court should also reassess whether prejudgment interest would be appropriate under the standards we have discussed.

        In addition, Kraus asserts that the court should have awarded prejudgment interest with respect to the $303,496.78 in lost profits. As discussed in detail above, we vacate the lost profits award and remand to the court for reconsideration. *Supra* ¶ 62. Should the court, on remand, again award lost profits to Kraus, it will need to consider any related claim for prejudgment interest anew.

damages awarded for breach of contract," namely, the $14,003.22 for breach of the Asset Purchase Agreement, the $108,833.31 for breach of the Profit Advance Agreement, and the $36,617.85 for breach of the agreement to reimburse Kraus.

¶95    The Beck Parties oppose 10% postjudgment interest here, arguing that the Kraus Parties incorrectly rely on an amended version of the statute. In the Beck Parties' view, the earlier version of the statute applies, and the agreements do not qualify for application of the 10% interest rate because they either specify an interest rate "or are not loan or forbearance contracts subject to the statute."

¶96    As discussed above, we agree with the Beck Parties that the Kraus Parties' claims to prejudgment interest cannot rely on the current statute's provision allowing for interest at 10% per annum for a claim for breach of contract. *Supra* ¶ 92. Nevertheless, we have determined that FLJ is entitled to prejudgment interest under the earlier version of the statute regarding the $14,003.22 related to the Asset Purchase Agreement because it involves a loan. *Supra* ¶ 85. For the same reasons, the 10% per annum interest rate applies for postjudgment interest on this amount, and the district court erred in imposing the rate under Utah Code section 15-1-4. We reject, however, Kraus's claim that the 10% per annum postjudgment interest rate applies to the $36,617.85 awarded for breach of the agreement to reimburse Kraus. Just as Kraus failed to demonstrate application of the 10% interest rate for prejudgment interest on this amount, *see supra* ¶ 91, he has failed to demonstrate that the district court erred in not applying this rate to this claim for postjudgment interest.[16]

---

16. Because we have vacated the district court's award for damages for breach of the Profit Advance Agreement, *supra* ¶¶ 71, 88, we do not address Kraus's argument relating to the

(continued…)

### C.    Punitive Damages

¶97    Kraus contends that the district court erred in denying his request for punitive damages. He argues, first, that the court applied "the wrong legal standard in evaluating whether punitive damages were warranted" and, second, that the court should have awarded punitive damages under the correct standard. Because we agree with Kraus on his first point, we remand for reconsideration without reaching his second point.

¶98    "In Utah, punitive damages are available only upon clear and convincing proof of willful and malicious or intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and disregard of, the rights of others." *Smith v. Fairfax Realty, Inc.*, 2003 UT 41, ¶ 27, 82 P.3d 1064 (cleaned up). In fact, the Utah Code provides that punitive damages are generally available "only if compensatory or general damages are awarded and it is established by clear and convincing evidence that the acts or omissions of the tortfeasor are the result of willful and malicious or intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others." Utah Code Ann. § 78B-8-201(1)(a) (LexisNexis 2018); *accord Jones v. Mackey Price Thompson & Ostler*, 2020 UT 25, ¶ 57, 469 P.3d 879.

¶99    Here, the district court declined to award punitive damages to Kraus, explaining that it did "not find, by clear and convincing evidence, that the Becks' conduct was so extreme and outrageous as to warrant the imposition of punitive damages." Although the court identified the correct burden of proof, it is not apparent from the court's reference to conduct that was not

---

postjudgment interest rate applied to that award. If, on remand, the court again awards damages for breach of that agreement, the court should assess the proper postjudgment interest rate under the standards we have discussed above. *Supra* ¶ 79.

sufficiently "extreme and outrageous" that the court considered whether that same conduct fell short of the punitive damages standard of "willful and malicious or intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference." *See Smith*, 2003 UT 41, ¶ 27 (cleaned up). We thus agree with Kraus that it is unclear whether the court applied the correct standard for punitive damages. Given this lack of clarity, the court should revisit its punitive damages decision on remand and demonstrate that it has applied the correct standard.[17]

D. Postjudgment Attorney Fees

¶100 As their final issue on cross-appeal, the Kraus Parties contend that they are entitled to "post-judgment, pre-appeal attorney's fees." Relying on rule 73(f)(3) of the Utah Rules of Civil Procedure, they claim entitlement to "fees incurred in an effort to enforce the judgment." The Beck Parties respond that the Kraus Parties' request before the district court in this regard "was premature and overbroad."

¶101 We agree with the Beck Parties that the Kraus Parties' request was premature under rule 73(f)(3). That rule provides that "[w]hen a party has established its entitlement to attorney fees under any paragraph of [rule 73], and subsequently . . . applies for any writ" or "files a motion pursuant to Rules 64(c)(2) or 58C . . . , the party may request *as part of its application for a writ or its motion* that the party's judgment be augmented . . . , and the clerk or the court shall allow such augmented attorney fees request without a supporting affidavit if it approves the writ or motion." Utah R. Civ. P. 73(f)(3) (emphasis added). Because the Kraus Parties' request was not properly made as "part of [an] application for a writ or [a] motion," they have not established their entitlement to

---

17. The parties did not brief whether punitive damages would still be available to Kraus should he fail to prove lost profits. Thus, in remanding this issue, we express no opinion on that question.

augmented attorney fees under rule 73(f)(3) at this juncture. *See id.* We thus decline to award them postjudgment attorney fees.

### III. The Kraus Parties' Request for Appellate Attorney Fees

¶102   Lastly, the Kraus Parties request that this court award them attorney fees incurred on appeal. Noting that the district court awarded them attorney fees, they claim that success on appeal should entitle them to receive appellate attorney fees.

¶103   Generally, "when a party who received attorney fees below prevails on appeal, the party is also entitled to fees reasonably incurred on appeal." *Telegraph Tower LLC v. Century Mortgage LLC*, 2016 UT App 102, ¶ 52, 376 P.3d 333 (cleaned up). Because the Kraus Parties were awarded attorney fees below but prevailed only in part on appeal, they are entitled to only those appellate attorney fees associated with the issues on which they have prevailed. *See id.* We remand for the district court to calculate those reasonable fees.[18]

### CONCLUSION

¶104   With respect to the Beck Parties' appeal, we affirm the district court's imposition of joint and several liability on the Becks. But we reverse and vacate the district court's damages award and remand for reconsideration. On remand, the court should (1) reassess lost profits and ensure that any such damages are reasonably certain, (2) ensure that Kraus's proceeds from

---

18. The Kraus Parties also request an award of costs incurred on appeal. Rule 34(a)(4) of the Utah Rules of Appellate Procedure provides that "if a judgment or order is affirmed or reversed in part, or is vacated, costs are awarded only as the court orders." Because the Kraus Parties did not exclusively prevail on appeal, and because of the difficulty in attributing costs to particular issues, we decline to award them costs.

DSS's liquidation do not include proceeds from the sale of KMB's equipment, and (3) reevaluate whether Kraus is entitled to damages under the Profit Advance Agreement.

¶105   On the Kraus Parties' cross-appeal, we conclude that FLJ is entitled to prejudgment and postjudgment interest at 10% per annum on the $14,003.22 related to the Asset Purchase Agreement, and Kraus is entitled to prejudgment and postjudgment interest at the rate provided by Utah Code section 15-1-4 on the $36,617.85 awarded for unpaid reimbursements. We also conclude that the district court should (1) revisit the interest issues with respect to the $108,833.31 related to the breach of the Profit Advance Agreement and any amounts it may award in lost profits or in connection with DSS's liquidation and (2) reevaluate whether punitive damages are appropriate. The Kraus Parties are not entitled to postjudgment attorney fees at this point, but we award them the appellate attorney fees they incurred for the issues on which they have prevailed on appeal. The district court should determine the amount of those fees on remand.

¶106   Accordingly, we affirm in part, reverse and vacate in part, and remand for further proceedings consistent with this opinion.

———————